K33LSADH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SADIS & GOLDBERG, LLP,

4                   Plaintiff,

5             v.                          14 Civ. 913 (LTS)(OTW)

6    SUMANTA BANERJEE,

7                   Defendant.
                                          Hearing
8    ------------------------------x
                                          New York, N.Y.
9                                         March 3, 2020
                                          10:00 a.m.
10
     Before:
11
                         HON. ONA T. WANG,
12
                                          U.S. Magistrate Judge
13

14                         APPEARANCES

15   SADIS & GOLDBERG, LLP
          Attorney for Plaintiff
16   BY:  BEN HUTMAN

17
          Pro-se Attorney for Defendant
18   BY:  SUMANTA BANERJEE

19   Also Present:
     Desi Ilieva, Paralegal, Sadis & Goldberg
20   Akshita Banerjee, Defendant's wife

21

22

23

24

25

 1              (Case called)

 2              THE COURT:  Good morning.

 3              MR. HUTMAN:  Good morning, your Honor.

 4              My name is Ben Hutman, for Sadis & Goldberg, LLP.  and

 5     with me is my colleague, my paralegal, Desi Ilieva.

 6              MR. BANERJEE:  Sumanta Banerjee.

 7              MRS. BANERJEE:  Akshita Banerjee.

 8              THE COURT:  All right.  We're here for an evidentiary

 9     hearing.  My understanding is that the key fact that needs to

10     be determined after this evidentiary hearing is what

11     Mr. Banerjee's domicile was at the time the complaint was filed

12     in this action.

13              A couple of things.  Because Mr. Banerjee is

14     representing himself, I want to let you all know I'm not going

15     to be making any rulings on the record.  This hearing is really

16     to get the facts and the testimony about, you know, the

17     exhibits, to get the facts on the record.  What I envision

18     happening might be another round of briefing afterwards.  I'm

19     not sure yet.  It may also be that after I have reviewed the

20     transcript from the hearing today, and seen the facts as

21     they've developed, and seen the testimony, and had some time to

22     digest it, that we may need followup factual development.  I

23     hope that won't be the case, but I wanted to let you know that

24     that is a possibility.

25              I also understand that there is an outstanding motion

1    for fees in an adverse inference outstanding.  The adverse

2    inference issue will be decided in conjunction with my report

3    and recommendation on this evidentiary hearing.  So I don't

4    need to hear argument about that.  And then also the fees issue

5    will be decided later, okay?

6              The other thing is I got an email, I guess, from

7    Ms. Banerjee last night about document production.  This

8    pertains to an exhibit that dates from 2017, right?  So I'm not

9    going to rule on it right now.  I'm going to construe it as a

10   motion either to exclude or a motion *in limine*.  But since I

11   really want to focus on the plaintiff's domicile in 2014, I'm

12   not sure that that exhibit is going to be relevant or

13   necessary.  I'm not precluding you from using it, because, you

14   know, ultimately it may be relevant.  But let's try to start by

15   focusing on establishing domicile pre-2014 and then facts that

16   would suggest whether domicile actually changed from

17   Connecticut to somewhere else.  Okay?  So maybe we won't have

18   to deal with it at all.  All right?

19             So, Mr. Hutman, I believe this is your motion.  So go

20   ahead.

21             MR. HUTMAN:  All right.  We'd like to --

22             THE COURT:  Oh, actually -- I'm sorry.

23             Before that, does anybody have any questions about

24   procedure or anything else?

25             MR. HUTMAN:  I would like to ask if Ms. Banerjee can

1   be excluded while Mr. Banerjee is testifying.  So we would like

2   her to not be in the room while he's testifying.

3              THE COURT:  Mr. Banerjee?

4              MR. BANERJEE:  I need her to help me with all the

5   papers and everything.

6              THE COURT:  Well, you should know your exhibits,

7   right?  I mean, you're representing yourself here.

8              MR. BANERJEE:  Yes.  But there are a lot of them, as

9   you have seen.  So --

10              MR. HUTMAN:  We don't have any issue of her coming

11   back in when he's putting on his case --

12              MR. BANERJEE:  But Mrs. Banerjee has already read my

13   deposition.  It's all on the record.

14              THE COURT:  You know what?  Since a lot of this may

15   turn on a credibility determination -- and I am sitting here on

16   the bench, and I can see Mrs. Banerjee and Mr. Banerjee -- I am

17   going to allow her to remain.

18              I mean, Mr. Hutman, you have taken both of their

19   depositions.  So to the extent you want to impeach credibility

20   with prior inconsistent statement, of course, you can do that.

21   I just don't see how it is going to make a material difference

22   in my credibility assessment anyway.  Okay?

23              MR. HUTMAN:  My primary concern is about new documents

24   that were produced after the deposition from third-party

25   subpoenas.  But I understand the --

1              THE COURT:  Which presumably she's seen, right?

2              MR. HUTMAN:  Sure.  I expected that.

3              THE COURT:  I see Mrs. Banerjee nodding, so I'm going

4      to take that as a yes for that.

5              How about this?  If there is a way to cabin that issue

6      or put it later, maybe we'll address the question later.  Why

7      don't you tell me when you're going to get to that point.  I

8      suspect that even if I excuse Mrs. Banerjee from Mr. Banerjee's

9      cross on those new exhibits, if we even get to them, I don't

10     know that it will make a material difference if when Mr.

11     Banerjee is presenting his version of the facts, he will have

12     had time to prep Mrs. Banerjee anyway and have a chance to tell

13     her what he said anyway.  So I'm not sure that it really would

14     make a difference.  But let's table that until -- you'll give

15     me a heads-up when you're getting to the exhibits the produced

16     exhibits.  Okay?

17             MR. HUTMAN:  Okay.  We had one other additional matter

18     -- sort of two.  But there were a couple of documents that were

19     produced on February 25th to us, two affidavits from people

20     that aren't here today, and a picture of the documents that

21     were produced to us, you know, the day before the hearing.  And

22     we would like those excluded.  Now, it doesn't matter from my

23     case.

24             There were some affidavits that were produced on

25     February 25th, the day that we filed the joint exhibit list,

1   and also a picture of a document, which is now in the list of

2   Exhibit 125, which plaintiffs would like excluded.  And we

3   understand that any ruling on that can wait until the documents

4   are produced, we just wanted to give the Court a heads-up about

5   it.

6           THE COURT:  All right.  Thank you.

7           So what are the exhibit numbers?  I heard 125.  What's

8   the other one?

9           MR. HUTMAN:  105 and 108.

10           THE COURT:  Okay.  105, 108 and 125.

11           Go ahead, Mr. Hutman.  I'm sorry I interrupted you.

12           MR. HUTMAN:  Okay.  The plaintiff is ready to call

13   Mr. Sumanta Banerjee.

14           MR. BANERJEE:  Before we start, can you let me know

15   the process?  Like, how does this work?  I mean, how long does

16   he have and how long do I have?

17           THE COURT:  It will depend on what the testimony is.

18           MR. BANERJEE:  So is that how it works?  I mean, I

19   just don't know.

20           THE COURT:  Yeah.  So you're a witness.

21           MR. BANERJEE:  Yes.

22           THE COURT:  You're going to be sworn to tell the

23   truth.  You'll be seated up here, and Mr. Hutman will ask you

24   questions.  To the extent that you feel like you should not

25   have to answer something, you know, you can let me know, and I

1    will try to make a ruling.  Because this is going to be

2    assessed and decided by me on the transcript and it's going to

3    be in the form of a report and recommendation, there isn't

4    really a jury who will be, as it were, affected by, you know,

5    testimony that shouldn't have been introduced.  So you can

6    certainly lodge your objection to being required to answer a

7    particular question, but the presumption is that you should be

8    required to answer a question.

9           The other point is that I may actually interrupt and

10   ask questions myself.  Sometimes I will do that because I need

11   to hear a clearer answer.  Sometimes I may do that just because

12   I want to move it along a little bit faster.  And other times

13   it might just be because I just have a question that, you know,

14   maybe Mr. Hutman was going to get to it but I just cut him off

15   because that's my prerogative.  Okay?

16          It's similar to rules in a deposition.  If you need a

17   break to use the facilities or something like that, just let me

18   know.  And we will wait for you to finish your answer to a

19   particular question and we'll take a quick break, and everybody

20   can do what they need to do on that break and then we'll come

21   back.  You can bring water with you.  I mean, it's going to be

22   very similar to a deposition, except we're in the courtroom and

23   you'll be on the witness stand.

24          MR. BANERJEE:  Okay.  There are post-trial papers that

25   are due, right, after this?

K33LSADH

1           THE COURT:  Yes.  That's what I said.  There will be

2    additional briefing that I'll ask for.  So like I said, I'm not

3    going to make any rulings of substance.  I'm not going to find,

4    for example, domicile in one place or another today or even

5    tomorrow.  There is a chance that -- I'm going to try to get

6    all the facts out that I think are necessary today.  There's a

7    chance when I am drafting my report and recommendation that I

8    may see gaps that I wished we had filled, in which case I would

9    either ask for additional information in the form of facts or

10   testimony, or supplemental briefing.  But you will always get a

11   chance to put your side in as well.  Okay?

12           MR. BANERJEE:  Okay.

13           THE COURT:  So nothing final is going to be decided

14   today.  Today is to get a clean transcript of statements under

15   oath, both statements under oath about personal knowledge, as

16   well as statements under oath about exhibits that have been

17   presented on the exhibit list.  Okay?

18           MR. BANERJEE:  Sounds good.  I can take notes over

19   there or?

20           THE COURT:  If you bring notes over there, I can ask

21   to see them.

22           MR. BANERJEE:  Yeah.  Sure.

23           THE COURT:  Okay.  And we can ask to have them

24   admitted.  Mr. Hutman will likely ask to have them admitted as

25   additional evidence.  So think about that before you ask to do

K33LSADH

1    that.  Okay?

2              MRS. BANERJEE:  Your Honor, can I ask one question,

3    please?

4              THE COURT:  Okay.  Just for the record, Mr. Banerjee

5    is the only party to this action.

6              And, Mrs. Banerjee, you are or are not a lawyer?

7              MRS. BANERJEE:  I am not.

8              THE COURT:  Okay.  So --

9              MRS. BANERJEE:  That's fine.  I understand.

10             THE COURT:  But at the same time, Mr. Banerjee is

11   proceeding pro-se, so I want to make sure that, A, you're not

12   acting as his lawyer, right, and that you do not have a law

13   degree.

14             MRS. BANERJEE:  No, I do not have a law degree and I

15   am not a lawyer.

16             THE COURT:  Okay.  But if you have procedural

17   questions, let's get them out so there's no misunderstanding.

18             MRS. BANERJEE:  The question was the email that I sent

19   to you yesterday evening was regarding that document from 2017.

20   That was produced by HRB --

21             THE COURT:  I understand.

22             MRS. BANERJEE:  Okay.

23             THE COURT:  We don't need to deal with that right now,

24   okay?

25             MRS. BANERJEE:  Okay.

1              THE COURT:  Because I'm not sure that we're going to

2     need to address that exhibit, okay?  And that way, I don't have

3     to rule on a dispute.  Okay?  All right.

4              Go ahead, Mr. Hutman.

5              MR. HUTMAN:  The plaintiff calls Sumanta Banerjee at

6     this time.

7              THE COURT:  Okay.  Come on up.

8     SUMANTA BANERJEE,

9         called as a witness by the Plaintiffs,

10        having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. HUTMAN:

13    Q.  Good morning, Mr. Banerjee.

14    A.  Good morning.

15    Q.  On August 10th, 2016, you filed a reply brief in support of

16    your motion to set aside the default judgment in this action.

17              Do you recall that?

18    A.  I don't.  But if you have it, I must have.

19    Q.  Can you open up Exhibit 31?

20              THE COURT:  That is also ECF No. 65 in this case.

21              THE WITNESS:  I can't find 31.  I'm sorry.

22              THE COURT:  Do you have extra copies, Mr. Hutman?

23              MR. HUTMAN:  Yes.

24              THE COURT:  Okay.

25    BY MR. HUTMAN:

1    Q.  Mr. Banerjee, do you recognize Exhibit 31 as the reply

2    brief that you filed in support of your motion to set aside the

3    default judgment in this action?

4    A.  Yes.

5    Q.  And you filed it on August 10th, 2016?

6    A.  That's what it looks like.

7    Q.  And I want you to turn to page 12 of the document at the

8    very bottom.

9         You see where you wrote: "Mr. Banerjee has no bank

10   accounts in Pennsylvania or anywhere in the United States?"

11   A.  Yes.

12   Q.  And you wrote that you do not own or lease property in the

13   United States?

14   A.  Correct.

15   Q.  And you do not earn in the United States or pay any state

16   or local taxes?

17   A.  Correct.

18   Q.  And that's something you wrote in the document that you

19   filed with this Court in 2016?

20   A.  Correct.

21   Q.  And if you turn back one page to page 11, in paragraph 23

22   about two-thirds of the way down, you wrote:

23        "The address that Mr. Banerjee has maintained and is

24   his permanent residence since 2009 is 58/1 Balllygunje Circular

25   Road, Kolkata-19; West Bengal, India."  Is that right?

1    A.   That's correct.

2    Q.   Now, I want to go to an affidavit that you filed in this

3    case, Exhibit 7.

4              Mr. Banerjee, do you recognize Exhibit 7 as the

5    affidavit that you swore to on December 18th, 2018, in

6    relationship to this matter?

7    A.   Yes.

8    Q.   And in paragraph seven, which is on page two of the

9    document, you see the last sentence you wrote:  "I have not had

10   U.S. income since 2009?"

11   A.   Correct.

12   Q.   And you have not filed state Pennsylvania taxes as a

13   result?

14   A.   Correct.

15   Q.   And that's a statement that you swore to when you filed

16   this affidavit, right?

17   A.   Yeah.

18   Q.   And I want to turn to paragraph 18.  And there you wrote:

19   "From 2009 to 2016, I did not have a permanent mailing address

20   in the U.S."  And you wrote that you do not have any bank

21   accounts in the U.S., you didn't pay any utility bills, you did

22   not have any interest in any corporate entity in the U.S.

23             Do you see all that?

24   A.   I see all that.

25   Q.   And that's also something that you swore to on December

1    18th of 2018?

2    A.   That is correct.

3    Q.   So you said that you didn't earn any income in the United

4    States or pay Pennsylvania state taxes.  So let's look at your

5    2013 Pennsylvania tax returns, Exhibit 37.

6    A.   Yes.

7    Q.   And Exhibit 37 is a joint tax return that was filed on

8    behalf of you and your wife, Mrs. Akshita Banerjee; is that

9    correct?

10   A.   Correct.

11   Q.   And it was filed for the year -- the tax year, 2013; is

12   that correct?

13   A.   Correct.

14   Q.   And the joint tax return lists both of you as consultants;

15   is that correct?

16   A.   I can see that.  I did not prepare the tax return.  It was

17   done without my knowledge.

18   Q.   I'll just ask the question again.

19            Does the joint tax return filed on your behalf list

20   you as a consultant?

21   A.   That's what it does.  I can see that.

22   Q.   And it lists your address as 1514 Cook School Road;

23   Pittsburgh, Pennsylvania; is that correct?

24   A.   I can see that, but it wasn't my address.

25   Q.   And also, on the right-hand side, there's a section that

1   says "residency status." Do you see that?  Right across from

2   where it says "consultants," it says "residency status" and

3   then it says "R."

4            Do you see that?

5   A.  Yeah.

6   Q.  And that means that the joint tax return was representing

7   that you were a Pennsylvania state resident; isn't that

8   correct?

9   A.  That is not true.

10  Q.  My question is:  Was this joint tax return, by putting the

11  letter "R" there, representing that you were a Pennsylvania

12  state resident at that time?

13  A.  It must.  I mean, that's what I see.  But it's not true.

14  Q.  And if you go down --

15  A.  I had nothing to do with Pennsylvania.  I had no income.

16  None of this income is mine.

17           THE COURT:  Okay.  You know what?  I'll take over the

18  questioning for a minute.

19           Who prepared these joint tax returns?

20           THE WITNESS:  I believe my wife did.

21           THE COURT:  Okay.  With a consultant or not?  I want

22  your answer.

23           THE WITNESS:  Yes.  She did it on some program.  She's

24  never done taxes in her life before.  We had just gotten

25  separated.  This was the first time she was filing taxes.  She

K33LSADH                          Banerjee - Direct

```
 1    was completely lost.  She put my name, which was how it was all
 2    the year, because I was pretty much the sole earner, as the
 3    first name.  She kept it at that even though the income was
 4    hers.  And there's W-2s to prove that.
 5             THE COURT:  What number exhibit number are we on
 6    again?
 7             MR. HUTMAN:  37 your Honor.
 8             THE COURT:  Thirty-seven.
 9             So this is a tax return for tax year 2012.  This
10    wasn't filed until 2018, right?
11             THE WITNESS:  No.  2013, I believe, your Honor.  There
12    was not tax return filed for 2012.
13             MR. HUTMAN:  Your Honor, if you turn to other pages,
14    the first page says the 2012 --
15             THE COURT:  Oh, I see.  Okay.  So this is for tax year
16    2013.  And when is it dated?
17             When was this filed, Mr. Banerjee?
18             THE WITNESS:  I don't know, your Honor.  I didn't know
19    it was filed.
20             THE COURT:  And whose signature is this on the second
21    page of joint Exhibit 37?
22             THE WITNESS:  I believe my wife signed my name and my
23    signature.
24             THE COURT:  Wait.  But there's two signatures there,
25    right, your signature and spouse's signature.
```

1          It's your testimony that your wife signed both?

2          THE WITNESS:  Yes.  Absolutely.

3          THE COURT:  All right.

4          THE WITNESS:  Your Honor, this was covered in the

5    deposition.

6    BY MR. HUTMAN:

7    Q.  Mr. Banerjee, just a few seconds ago, you said that your

8    wife had not filed tax returns prior to this tax return?

9    A.  By herself, yes.

10   Q.  So although this is not the order that I originally

11   intended.  Let's turn to Exhibit 43.

12   A.  Yes.

13   Q.  And do you recognize that Exhibit 43 is a transcript of tax

14   returns that were produced to us by the IRS, the Internal

15   Revenue Service?

16   A.  Yes.

17   Q.  And if you turn to page five of the document --

18   A.  Yes.

19   Q.  -- the numbers on the bottom.

20   A.  Yes.

21   Q.  Do you see there was information about a tax return for the

22   tax period ending in December 31st, 2012?

23   A.  Yes.

24   Q.  And if you look down, it says:  "Filing:  Status, married,

25   filing joint?"

1  A.  Yes.  The earnings were $10.  Is that the document?

2  Q.  That's the one I'm talking about, yes.

3          And that was a tax return filed by your wife for the

4  year 2012; is that right?

5  A.  I don't think so.  But you can ask her when you -- I doubt

6  she would file a $10 tax return.

7  Q.  So is it your testimony that the IRS just recorded that tax

8  return magically?

9  A.  I can't get into the minds of the IRS, but this is very

10  highly unlikely.

11  Q.  Now, let's go back to Exhibit 37.

12  A.  Yes.  I'm there.

13  Q.  Now, Exhibit 37 is a joint tax return filed on behalf of

14  you and your wife; is that correct?

15  A.  Yes.  This is what we were talking about earlier, right?

16  Q.  Yes.

17  A.  The same document.

18  Q.  Exhibit 37.  Yes, the 2013 joint tax return.

19  A.  Okay.

20  Q.  And it was a joint return filed on behalf of you and your

21  wife; is that correct?

22  A.  Yes.  That's what it looks like.

23  Q.  And your testimony was that your wife filed this without

24  your permission?

25  A.  Or knowledge.

K33LSADH                    Banerjee - Direct

1  Q.  Isn't it true though that she got your permission after the

2  fact?  I mean, she told you about it shortly thereafter, and

3  you said it was fine; isn't that true?

4  A.  I have no idea how long after, but it was a while after.  I

5  don't know exactly how long.  I mean, it could have been three

6  months, four months, five months.  I have no idea.

7          THE COURT:  Okay.  But in an order of months,

8  Mrs. Banerjee did tell you that she had filed tax returns on

9  your behalf and signed your name to them, and you essentially

10  were like:  Okay?

11          THE WITNESS:  And I had no idea what she had filed, so

12  I asked her for it.  Never received it.

13          And remember, we weren't together at that time, so I

14  had to get that, to see even what was filed.  She never sent it

15  to me.  So --

16          THE COURT:  Okay.  But you never pressed it after that

17  though.

18          THE WITNESS:  Yeah.  I mean, I basically left it as --

19  I believe a separation agreement, that we would both file

20  taxes.  So I kind of left it to her.  I had disengaged

21  completely.  So it was her call, whatever she wanted to do.

22          THE COURT:  Okay.  But you agreed to it, essentially?

23  I mean, you never objected to it later, did you?

24          THE WITNESS:  When I saw it, it was too late to do

25  anything.  When I saw it, I saw it three years later.

SOUTHERN DISTRICT REPORTERS, P.C.

1            THE COURT:  Wait.  You just said that you found out

2    that she had done --

3            THE WITNESS:  I had --

4            THE COURT:  Wait.  Wait.  Wait.  Do not interrupt me.

5            THE WITNESS:  Yes.  I'm sorry.

6            THE COURT:  But you said that when you first became

7    aware of it, it was on the order of three, four, or five months

8    later.

9            THE WITNESS:  Right.

10           THE COURT:  Then you asked to see copies.

11           THE WITNESS:  Yes.

12           THE COURT:  And you didn't get them, right?

13           THE WITNESS:  Right.

14           THE COURT:  And you did not press it?

15           THE WITNESS:  I asked to see copies a few times and I

16   never got them.  And I was helpless.  I couldn't do anything,

17   your Honor.  What could I do?

18           THE COURT:  You keep asking, right?

19           THE WITNESS:  Well, that's what I did.

20           THE COURT:  You can keep asking, no?

21           THE WITNESS:  Except I did ask, and then she said her

22   computer got stolen and her tax returns got lost.

23           THE COURT:  But somehow you managed to see them three

24   years later.

25           THE WITNESS:  When the -- whatever the -- when I was

1    here, back in this country, we went to -- I said this is

2    completely wrong because my capital gains, she put it as

3    business income.  She had me as the first earner of her W-2s.

4    The capital gains, if you don't earn $75,000, you don't pay any

5    taxes on it at the federal level.  And the state level has no

6    claims on it because these were earned -- Connecticut could

7    have a claim on it if I was a resident of Connecticut.  But no

8    claims on it.  But I was a resident at that time in India with

9    a lease in an apartment.

10             THE COURT:  Okay.  Time out.

11             THE WITNESS:  Yeah.

12             THE COURT:  During this period from 2013 to 2016 that

13   you assert that your wife filed tax returns without your

14   knowledge and consent and you did not see them, did you seek

15   tax advice from anybody else outside of your marriage?

16             THE WITNESS:  No.

17             THE COURT:  A lawyer, a tax preparer, an accountant,

18   officially or unofficially?

19             THE WITNESS:  No.  At that point I sought advice in

20   India because that's what I was basically focused on.

21             THE COURT:  On U.S. tax law?

22             THE WITNESS:  No.  On Indian tax law, because that's

23   what I was doing at that time.

24             THE COURT:  We're talking about the U.S. tax forms.

25             THE WITNESS:  But the U.S., I did not.

1              THE COURT:  Okay.

2              THE WITNESS:  I did not.

3              THE COURT:  So you came to the determination that you

4   were -- quote, end quote -- "helpless," on your own without

5   consulting anybody else in the United States about what you

6   could do about the tax forms that you now claim were either

7   incorrect or filed without your consent or knowledge?

8              THE WITNESS:  Well, they were filed without my consent

9   or knowledge.  I did not -- I pressed and I didn't get it.  And

10  when I asked again, she said they were lost.  Then I got a copy

11  of some kind of a review, which is when I realized it was all

12  wrong.  But that was already probably like a year and a half,

13  two years into it.  And we went to HRB, and they said time has

14  passed to do anything on this.

15             THE COURT:  Okay.  Sorry, Mr. Hutman, for the

16  interruption.

17             MR. HUTMAN:  No problem, your Honor.

18             THE WITNESS:  And I was --

19             THE COURT:  Wait, wait, wait.  Mr. Hutman is asking

20  the questions here.

21             THE WITNESS:  Okay.

22  BY MR. HUTMAN:

23  Q.  Isn't it true, Mr. Banerjee, that Mrs. Banerjee got your

24  permission or your acquiescence within a few months after the

25  filing, that you were fine with whatever she did?

K33LSADH                        Banerjee – Direct

1   A.  I just said it, that I did not know what was filed.  So how

2   can I agree to it?

3   Q.  Well, you could say:  I trust you and I'm fine with

4   whatever you filed.

5            Isn't it true that did you that?

6   A.  She told me that she had filed it.  That's all.  I asked to

7   see it.  I asked to see it a number of times.

8   Q.  So is it your testimony that you never gave her

9   authorization even after the filing?

10  A.  That is correct.

11  Q.  Now, I want to turn to page four of the document.

12           Do you see it has your name at the top, "Sumanta

13  Banerjee?"

14  A.  Uh-huh.

15  Q.  And then it says:  "Advise on investment advice." And then

16  underneath that it has the name of an entity ZBAC, LLC?

17           Do you see that?

18  A.  Yes.

19  Q.  And ZBAC, LLC is a Delaware entity; is that correct?

20  A.  Yes.

21  Q.  And if you go over to the far right side, you see where it

22  says "home office?"

23  A.  I do.

24  Q.  And there's a little "Y" there?

25  A.  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K33LSADH                         Banerjee - Direct

1   Q.  That indicates that this business, ZBAC, LLC, had a home

2   office?

3   A.  Okay.

4   Q.  And the address listed is 23 Soundview Farm Road; Weston,

5   Connecticut.  Do you see that?

6   A.  Yes.

7   Q.  And is that the Connecticut house that you and your family

8   used to live in at least prior to 2009?

9   A.  Correct.

10  Q.  And it shows over here gross receipt or sales of 107,346.

11  Do you see that?

12  A.  Yes.

13  Q.  Is that the money that you referred to just a minute ago

14  when talking to the Judge as a capital gain?

15  A.  Correct.

16  Q.  And that was a capital gain that you earned in the United

17  States in the year 2013, wasn't it?

18  A.  No.  I earned the capital gain over a period of time

19  because it's an asset.  It's a carried interest.  It started in

20  2002 and it went on.  So various funds, I managed.  That's how

21  the assets keep growing as the performance of the fund gets

22  better and better.  And the asset -- and that was the return on

23  the carried interest, the capital gain, based on the

24  performance of the fund.

25  Q.  That was a capital gain -- you received a check?

1    A.  I received a check.  But if you say that it was earned, it

2    was earned as a capital gain over this period.  The check was

3    given to me in 2013.

4    Q.  Okay.  So let me just clarify for the record.  Try not to

5    interrupt the questions.

6            You received a check in excess of $107,000 --

7    A.  Correct.

8    Q.  -- that you characterized as a capital gain just a few

9    minutes ago; is that correct?

10   A.  Yes.

11   Q.  And you received that check in 2013?

12   A.  Correct.

13   Q.  And you never recognized any gain related to that $107,000

14   prior to the year 2013, did you?

15   A.  It's in the statements of the fund.  You know exactly what

16   it was.

17   Q.  Let me rephrase that question.

18           You never recognized, for tax purposes, a gain on any

19   of that $107,000 prior to 2013; isn't that correct?

20   A.  Correct.

21   Q.  So you would agree then that when you put in your affidavit

22   that you had earned no income in the United States between 2009

23   and 2016, that was false because you had earned $107,000 in

24   2013?  Isn't that true?

25   A.  There is a difference, Mr. Hutman, between ordinary income

1   or what is classified as income and what is classified as

2   capital gains.  This is an IRS statute.  So when I say I did

3   not have any income, I had capital gains on assets that

4   basically earned.  And those could disappear as well.  And

5   they're passive in some ways because I'm not in control of

6   those funds any longer.

7   Q.  You didn't limit your statement in your affidavit or in

8   your brief to ordinary income, did you?

9   A.  I'm talking about income versus capital gain.

10  Q.  Are you aware that capital gains are also a form of income

11  under the IRS code?

12  A.  From my standpoint, there's a difference between capital

13  gain and income and ordinary income.  And what I meant was

14  ordinary income, because I had no income in the U.S. from 2009

15  till even now.

16  Q.  So you didn't mean, when you wrote you had no income, that

17  you didn't earn any money in the United States or you didn't

18  gain any profit in the United States, you simply meant that you

19  didn't have anything that you considered to be declarable as

20  ordinary income as it's defined under IRS code?

21  A.  Correct.

22  Q.  So you may have had millions and millions of dollars of

23  capital gains or other types of profit, but if it wasn't

24  considered to be ordinary income under the IRS code, you would

25  have been fine with your statement, as honest in your affidavit

1    and in your brief; is that true?

2    A.  Absolutely.  If I have investment accounts and I have

3    investments that went on from -- so there is a partnership that

4    I managed we -- as in my wife and I -- were investors in.  So

5    that's separate and distinct from the capital gains thing that

6    I'm talking about, because that comes to me by virtue of

7    getting carried interest.  That is just a partnership that was

8    there.  I had turned over all these assets to my wife as part

9    of the separation agreement.

10         So I had no assets.  I had no income.  Even this

11   capital gain, I endorsed the check over to my wife as part of

12   the separation agreement.  That was our understanding, and I

13   made sure I did that.

14   Q.  Now, in 2013, your wife was living in Pittsburgh

15   Pennsylvania; isn't that correct?

16   A.  2013 my wife was living in Pittsburgh, yes.

17   Q.  And yet on this joint tax return, you listed -- the joint

18   tax return lists you, Sumanta Banerjee, as having a home office

19   at 2370 Farm Road; Weston, Connecticut.

20         Isn't that also correct?

21   A.  You really have to ask my wife because I cannot speak to

22   any of this.  It's not like I did these taxes.  I know nothing

23   about these taxes.  I've seen it when you showed it to me.

24   I've seen it before on a very limited scale -- not the IRS or

25   Pennsylvania has produced as the full version.  So this is --

1    again, it's all news to me.

2    Q.  Is it your testimony that when your wife put down in this

3    tax return that there was a home office that had expenses of

4    $107,346, that was a false statement?

5    A.  I have no idea.  You have to ask my wife.

6    Q.  Now, I want to turn to Schedule D, which is page 6 of the

7    document -- actually, one more question before I get to that.

8           What was the name of the entity for which you had that

9    carried interest capital gain in 2013?

10   A.  Common Fund Distressed Partners II, I believe -- or one.  I

11   can't remember exactly.  But I ran them both.

12   Q.  Okay.  Now, this Common Fund Distressed Partners, that

13   wasn't a Pennsylvania entity, was it?

14   A.  Excuse me?

15   Q.  The Common Fund Distressed Partners I or II, they weren't

16   Pennsylvania entities; isn't that correct?

17   A.  No.

18   Q.  So let's turn to Pennsylvania Schedule D, which is page six

19   of the document.  You see that at the top it says "Sumanta

20   Banerjee," the name of the taxpayer filing this schedule?

21   A.  Okay.

22   Q.  And then on line six, it shows Net Pennsylvania S.

23   Corporation & Partnership gain or loss from your P.A. schedule,

24   and then it has "minus $419."

25           Do you see that?

1    A.   I do.  I didn't prepare this, obviously.

2    Q.   According to your 2013 Pennsylvania joint tax return filed

3    on your behalf, you had an interest in a Pennsylvania S. Corp.

4    or partnership in 2013; isn't that true?

5    A.   It's news to me.

6    Q.   You would agree that this joint Pennsylvania tax return, at

7    the very least, contradicts the claims that are in your brief

8    and affidavit that you didn't have an interest in any business

9    entity in the United States in 2013, right?

10   A.   I didn't, and I do not.  And whatever I did, I turned it

11   over to my wife as part of the separation agreement in 2012.

12   Q.   I'm going to ask the question again --

13   A.   I have no knowledge of her S. Corp -- any interest in any

14   S. Corp.

15   Q.   I'm going to ask the question again.

16          You would agree that this joint tax return, filed on

17   your behalf for 2013, whether it's true or not, contradicts

18   what you swore in your affidavit, that you did not have an

19   interest in any United States entity in 2013?

20   A.   It certainly contradicts.

21   Q.   And you would agree that this joint tax return for 2013

22   filed on your behalf --

23   A.   Without my authorization.

24   Q.   -- with or without your authorization, contradicts the

25   statement that you did not file Pennsylvania state resident

1    taxes since 2009?

2    A.   I did not.

3    Q.   Well, my question is whether this joint tax return, whether

4    it was falsely filed or filed truthfully, contradicts the

5    statement that you made, that no Pennsylvania states taxes were

6    filed for you in 2013?

7    A.   Again, that is my statement, that I did not file anything.

8    And I hold to that statement.  So I'm not going to answer

9    anything more on this subject.

10             THE COURT:  Wait, wait, wait.  No.  You don't get to

11   decide whether you answer a --

12             THE WITNESS:  Because it's --

13             THE COURT:  Stop.  You do not argue with me.

14             THE WITNESS:  I'm sorry.

15             THE COURT:  You do not argue with Mr. Hutman, okay?

16   You do not get to choose whether you answer questions or not,

17   and you do not get to unilaterally say, I'm tired of answering

18   these questions.

19             That said, Mr. Hutman, I think you've established what

20   you need to establish with these documents.  So, you know,

21   again, we don't have a jury here, so trust that I can put -- I

22   can connect the dots that you're laying out, okay?  So let's

23   move on, because I don't plan on being here all day.

24             MR. HUTMAN:  Understood, your Honor.

25             THE COURT:  Thank you.

K33LSADH                      Banerjee - Direct

1    BY MR. HUTMAN:

2    Q.   Let's turn to Exhibit 38.

3              Mr. Banerjee, do you recognize Exhibit 38 as a 2014

4    Pennsylvania tax return filed on your behalf?

5    A.   Again, I know nothing about it since I was advised by HRB

6    that I did not need to file Pennsylvania taxes.

7              THE COURT:  When were you advised by HRB that you

8    didn't need to file Pennsylvania taxes?

9              THE WITNESS:  This was whenever -- I try to remember

10   the exact date, but probably around 2016 or so when we were

11   filing the 2014 taxes.

12             THE COURT:  So in or about 2016, you sought advice --

13             THE WITNESS:  Yes.

14             THE COURT:  -- from HRB about whether you needed to

15   file income tax returns for tax year 2014, correct?

16             THE WITNESS:  Correct.

17             THE COURT:  And you were advised by HRB that you did

18   not need to; is that right?

19             THE WITNESS:  That's correct.  I did not need to file

20   PA taxes because I was not a resident of PA.  And they have a

21   letter.  And they're appealing the PA stuff.

22             THE COURT:  When you say "they're appealing the PA

23   stuff" --

24             THE WITNESS:  Because I --

25             THE COURT:  Wait.  Do not interrupt.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K33LSADH                    Banerjee – Direct

1              THE WITNESS:  I'm sorry.  I --

2              THE COURT:  Stop.  The court reporter cannot get all

3    of this down on the transcript unless you wait until the

4    question is done.

5              THE WITNESS:  I'm new to this.  I'm sorry, your Honor.

6              THE COURT:  So as far as I understand, you're not

7    necessarily new to testimony under oath.

8              So when you stay "this PA stuff," what do you mean by

9    that?

10             THE WITNESS:  So 2014 taxes were not filed, and so

11   when I had come back -- I believe in 2016, sometime towards the

12   end of the year -- I went to HRB with my wife, and that's when

13   I saw the 2013 tax returns.  That's when I was advised that it

14   was too late.

15             The 2014 taxes, I was advised that because of my

16   situation, because I lived in India and we were separated, and

17   I had residence in India, that for 2014 I should definitely not

18   file PA taxes and the only income that I should file was the

19   $2500 of capital gains that I received from the common fund,

20   which was, you know, basically belonged to my wife anyway.

21             So that was what the advice was, and that was what we

22   filed.  And they have written a letter to that, to

23   Pennsylvania, basically appealing the whole tax situation on my

24   behalf for both 2013 and 2014.

25             THE COURT:  So as of 2020, as we sit here today on

1    March 3rd of 2020, the issue of whether you were required to

2    file taxes or could change your tax returns from 2013 or 2014

3    is still an open issue; is that right?

4              THE WITNESS:  I know they said that we cannot change

5    all the mistakes that were made in 2013 federal tax returns;

6    however, PA tax returns -- PA had no claim on the carried

7    interest that I earned or that I received a check for that

8    year.  And in 2014, there was a bigger amount of $430,000,

9    roughly, that I received a check for.

10             THE COURT:  And that's the issue that's still being

11   appealed?

12             THE WITNESS:  That is still being appealed.

13             THE COURT:  Okay.  Mr. Hutman?

14             MR. HUTMAN:  Thank you, your Honor.

15   BY MR. HUTMAN:

16   Q.  Mr. Banerjee, you just said a few seconds ago that HRB told

17   you that you didn't need to file a 2014 Pennsylvania tax

18   return; is that right?

19   A.  That's correct.

20   Q.  Can you turn to the second page of this document, Exhibit

21   38?

22             Wasn't this document your Pennsylvania tax return for

23   the year 2014, prepared by HRB Tax Group and filed on October

24   16th, 2017?

25   A.  Yes.  I see that, but it's not my signature.  Again, I

1    don't know when this got done.  It was done without my

2    knowledge.  If you could see the letter -- the appeal that they

3    have written, they clearly state I'm not a Pennsylvania

4    resident.  And that's what they're appealing.

5    Q.  So, Mr. Banerjee, is it your testimony that HRB told you in

6    2016 that you didn't need to file 2014 Pennsylvania state

7    residency tax returns, and that in 2017 filed, those tax

8    returns without your knowledge or consent?

9         Is that your testimony?

10   A.  But that's what it appears, because this is not my

11   signature.  This, again, is my wife's signature; it's not mine.

12   And they probably made a mistake, because that's what it was.

13   Q.  Isn't it true, Mr. Banerjee, that your wife got your

14   permission to sign this tax return on your behalf prior to it

15   being filed?

16   A.  I don't think so.

17   Q.  Now, I want to go back to the first page of the document.

18   This 2014 tax return, filed on your behalf in 2017, shows your

19   occupation as an investment consultant; isn't that correct?

20   A.  Where is that, Mr. Hutman?

21   Q.  The first page, where it says "occupation" at the top.

22   A.  Okay.

23   Q.  So that's correct, that it puts you down as an investment

24   consultant?

25   A.  Yes.

1    Q.  And it shows your address for the year 2014 as 1514 Cook

2    School Road; Pittsburgh, Pennsylvania.  Is that also correct?

3    A.  That's what it shows.

4    Q.  And if you go over to the column on the side where it says

5    "residency status," you see there's a little "R," next to where

6    it says "residency status?"

7    A.  Yeah, I see that.

8    Q.  And that signifies that HRB filed this on your behalf,

9    stating that you were a Pennsylvania resident in the year 2014;

10   isn't that correct?

11   A.  That's what it appears.  However, just to make sure that --

12   I'm confused by this, obviously.  The PA -- the federal taxes

13   that were filed on my behalf by HRB has my India address,

14   because that was my address for that full year.  And that's how

15   they filed it.  So this is gross negligence, in my view, where

16   they're arguing that I'm not a PA resident in all the appeals

17   for 2013 and 2014.  They filed my federal taxes with my India

18   address, and now they've filed PA taxes claiming that I was a

19   resident of PA, which I didn't sign.  I had never seen this.

20   If I had ever seen this, I would have stopped it.

21   Q.  Isn't it true, Mr. Banerjee, that this tax return was filed

22   in October of 2017, prior to the issue of your domicile

23   becoming a matter in this case?

24   A.  Correct.

25   Q.  Now, I want you to turn to Schedule A, which is page three

K33LSADH                        Banerjee - Direct

1    of the document.

2    A.   Page three?

3    Q.   Yes.

4    A.   Of this same document, right?

5    Q.   Of Exhibit 38.

6    A.   Thirty-eight.   Okay.

7    Q.   And this Schedule shows you earning interest income,

8    reported on your federal return as $31; is that correct?

9    A.   Okay.   Mr. Hutman, do you have my federal tax returns also

10   so that I can see?

11   Q.   We'll get to it.   At this stage, I'm asking the questions.

12   You'll have your opportunity.

13   A.   You'll have to go to my federal tax returns.   I see what it

14   says, Mr. Hutman, so --

15   Q.   And if you turn to the next page, Schedule B, you see that

16   your tax return from 2014 shows you having dividend income also

17   from your federal return as $81.

18   A.   Okay.

19   Q.   You see that?

20   A.   Yes.

21   Q.   And the two Pennsylvania tax returns that we just looked

22   at, Exhibits 37 and 38, those weren't documents that you

23   produced to us personally; isn't that right?

24   A.   I don't know if I even have them.

25   Q.   They were produced to us by the Pennsylvania Department of

1  Revenue in a response to a subpoena, weren't they?

2  A.  I believe so.

3  Q.  Now, you already mentioned this earlier, so we could

4  possibly get to this quicker.

5         Isn't it true that in 2017 the state of Pennsylvania

6  notified you that it believed that you had earned over $430,000

7  in 2014?

8  A.  I don't recall when.

9  Q.  Let's look at Exhibit 35.

10  A.  Yes.

11  Q.  Do you see that?  This is a notice dated April 14th, 2017,

12  on the first page?

13  A.  Yes.

14  Q.  And if you turn -- and this is a document from the

15  Pennsylvania Department of Revenue, correct?

16  A.  Yes.  That's what it looks like.

17  Q.  If you turn to page three of the document.

18  A.  Yeah.

19  Q.  Do you see that line four shows net income or loss of

20  $431,610 for the year 2014?

21  A.  Yes, I see that.

22  Q.  And this is what you were referring to when you said that

23  there was an appeal, it was with respect to this $431,610; is

24  that correct?

25  A.  Correct.

1   Q.  HRB isn't appealing the $31 and the $81 that were

2   referenced in the 2014 tax return, are they?

3   A.  I don't think so.

4   Q.  And this Department of Revenue notice was sent to you at

5   1514 Cook School Road; Pittsburgh, PA, right?

6   A.  Yeah.  That's what it looks like.

7   Q.  And that's where you were living as of April 14th, 2017,

8   correct?

9   A.  Correct.

10  Q.  And this is what you were claiming was a capital gain that

11  you earned in 2014 in the United States; isn't that correct?

12  A.  Correct.

13  Q.  And this is also inconsistent with your affidavit and your

14  brief that claimed you had no income in the United States

15  between 2009 and 2016; isn't that also true?

16  A.  Again, I can't tell how you classify income versus capital

17  gain.  I had no income but I had capital gains.

18  Q.  And what was this money from?

19  A.  This money was, again, from one of the funds that I

20  managed.  And it was a carried interest check.

21  Q.  Do you know the name of the fund?

22  A.  Common Fund Distressed Partners -- I believe it was II.

23  Q.  So I want you to turn to Exhibit 91.  This is one of the

24  new HRB documents that were produced after the deposition.  So

25  I didn't previously have a chance to ask you about it.

1    A.  Yeah.

2    Q.  If you turn to page two of this document, you see it's a K1

3    for Common Fund Distressed Partners II?

4    A.  Correct.

5    Q.  And this is for 2013; is that right?

6    A.  Yes.

7    Q.  And this is the fund that you had just referenced, the one

8    that had sent you a check for $430,000 in 2013, correct?

9    A.  Yes -- 2014.

10   Q.  But was it also the fund that sent you a check for 107-plus

11   thousand in 2013?

12   A.  No.  That probably was.  As I said, I don't recall exactly.

13   This could have been it or it could have been Partners I.

14   Q.  Now, you had mentioned that the check for 2013 had come to

15   you and then you had endorsed it over to your wife.

16        Do you recall that?

17   A.  Correct.

18   Q.  Was your --

19   A.  As I did with --

20   Q.  Was your wife one of the partners also together with you in

21   the Common Fund Distressed Partners I, just like she is listed

22   here as a partner in Common Fund Distressed Partners II?

23   A.  No.  So I didn't have any investments from a partnership

24   standpoint.  I just ran the fund.  So this -- we were

25   investors.  We had money in the -- in the previous one, we did

1    not have money in.  So we were not exactly partners, but I ran

2    the fund.  As a result, I had a certain amount that was always

3    given to me as a carried interest.

4    Q.  So let's turn to the page with the 2014 table, page six of

5    the document -- sorry, page seven of the document.

6          And do you see that this is the 2014 K1 for your

7    interest in Common Fund Distressed Debt Partners II?

8    A.  Correct.

9    Q.  Now, when you put in your affidavit that you had no

10   interest in any U.S. entities between 2009 and 2016, were you

11   neglecting to mention your interest in Common Fund Distressed

12   Debt Partners II, that you had an interest in 2013 and 2014 at

13   least?

14   A.  I had turned over all those interests to my wife as part of

15   the separation agreement in 2012, June or July.

16   Q.  Did you ever notify Common Fund Distressed Partners II that

17   you had assigned your interest over to your wife?

18   A.  It was all going to go to her anyway.  We hadn't formalized

19   anything.  But as a matter of the separation agreement, I had

20   turned it all over by virtue of our agreement.

21   Q.  You never signed an assignment agreement, though, about

22   your interest in Common Fund Distressed Debt Partners II?

23   A.  All assets belonged to her.

24   Q.  Well, I understand that.  But you never formally ever

25   assigned this asset, your interest in Common Fund Distressed

1   Debt Partners II, over to your wife in 2013 or 2014?

2   A.   No.   Neither did I sign all the fidelity accounts either.

3   But they all belonged to her.

4   Q.   You say "they all belonged to her."   Essentially, do you

5   mean that in your mind or your heart you believe them to belong

6   to her, but not that the entities that controlled those

7   interests knew or understood you to have signed over to your

8   wife?

9   A.   Those entities were wrapping up, and basically the carried

10   interest check was going to come always in my name because I

11   was the person that was -- it was very complicated ownership

12   documents that were signed by me and the common fund.   I had

13   ownership.   And as a result they would only give the checks to

14   me.

15          This was an investment.   It was a small amount, at

16   least from my standpoint, and it all went into the fidelity

17   account.   So all these things, all these distributions went

18   into the fidelity account, which I had zero control of because

19   my wife had changed the passwords, etc., etc.   And I had

20   essentially given her complete control of all this money, and

21   everything that I owned in the U.S. was hers.

22   Q.   From the perspective of Common Fund Distressed Debt

23   Partners II and fidelity, from their perspective, you were

24   still a person that had an interest in the investment accounts

25   and in this limited partnership; isn't that correct?

1  A.  Yes; technically.

2  Q.  So it wasn't misleading for you to write in your affidavit

3  that you had no interest in the U.S. entities when those U.S.

4  entities believed that you had interest in them?

5  A.  No.  It wasn't misleading at all.  It was by virtue of the

6  separation agreement I had given everything to my wife.  So it

7  wasn't misleading at all.

8  Q.  In your brief that you filed August 10, 2016, you never

9  mentioned any separation agreement, did you?

10  A.  I don't know.  Which one are you referring to?

11  Q.  The one that we looked at, Exhibit 31.

12  A.  Yeah.  I didn't want it to be in the public domain.  But my

13  counsel afterwards put it in to the appeals after reviewing it.

14  This was done in 2012.  It was way before Sadis & Goldberg, you

15  know, decided to sue me.

16  Q.  So there was no way for the Court or plaintiff to know that

17  when you said you didn't have any interest in U.S. entities,

18  what you really meant was that, between you and your wife, you

19  had agreed to give it to her, and the entities were just never

20  made aware of it?

21  A.  Because they were in the joint name, she was going to get

22  it anyway.  If it was in my name and only my name, I would have

23  probably sent them a letter saying, please, you know, change my

24  name to my wife's name.  But there wasn't anything.  This was

25  all on the joint accounts, pretty much.

1   Q.  And the $430,000, your wife would have had no interest in

2   automatically because you were the person that earned it by

3   virtue of your management of the common fund, not as a matter

4   of your interest in the entity; is that right?

5   A.  I earned it.  It's a capital gain that I earned.  And it

6   was paid out over the years that I earned it.  And it was paid

7   out in 2014, which is when I endorsed the check over to her.

8   Q.  I just wanted to clarify.

9            The reason you needed to endorse the check was because

10  the check was made out only to you and not to her?

11  A.  Correct.

12           THE COURT:  Can I pause for a second?

13           Mr. Hutman, how much longer do you have with Mr.

14  Banerjee?

15           MR. HUTMAN:  I can't say we've gotten very far,

16  unfortunately.  Maybe an hour and a half.

17           THE COURT:  All right.  We're going to take a break

18  after I'm done talking right now.

19           I want you to take a look -- remember, there's no jury

20  here, okay?  I get what you're trying to do.  Let's assume that

21  you're going to continue to get what you would characterize as

22  self-serving testimony from Mr. Banerjee.  Understand that I

23  can connect the dots.  So why don't you take a break and think

24  about focusing on authenticating documents that you need

25  authenticated, try to minimize any amount of argument back and

1   forth with him.  You're going to have -- I mean, there is a

2   fundamental factual dispute here, right, which is up to me to

3   resolve.  I don't think you're going to get your Perry Mason

4   moment where Mr. Banerjee suddenly breaks down on the stand and

5   says, Oh, you're right, you know, my domicile was in the United

6   States at the time that was filed.  You're not going to get

7   there.  So what I want you to do is focus on authenticating

8   what you need to authenticate so that in a post-hearing brief,

9   you can tie these points together, okay?

10          Assume that I can assess -- I will make my own

11  assessments about credibility here of both Mr. and

12  Mrs. Banerjee, and you don't need to engage in sort of

13  prolonged back and forth about, you know, whether this is or is

14  not -- you know, what these documents might mean.  You're going

15  to make your arguments, he's going the make his arguments.

16  Focus on what facts and admissions you need so that you can

17  write a solid post-hearing brief, and also what documents you

18  might need to establish domicile prior to the time of the

19  events in question, and then what other information or facts

20  you might only be able to get from Mr. Banerjee.  Okay?

21          So let's take a 15-minute break.  And then we'll

22  resume with Mr. Banerjee, okay?

23          MR. HUTMAN:  Sure.  Thank you, your Honor.

24          THE COURT:  Thank you.

25          (Recess)

1             THE COURT:  All right.  Please be seated.

2             All right.  Go ahead, Mr. Hutman.

3             MR. HUTMAN:  Thank you, your Honor.

4    BY MR. HUTMAN:

5    Q.  Okay.  Mr. Banerjee, let's look at Exhibit 36.

6             Mr. Banerjee, do you recognize that Exhibit 36 is the

7    tax return filed on your behalf for the year 2014, the federal

8    tax return?

9    A.  Yes.

10   Q.  And this return shows an address for you in India; is that

11   correct?

12   A.  Correct.

13   Q.  Is that address correct?

14   A.  That is -- it's -- there is -- I think he got the D and the

15   G confused.  So it's 547G.  That's where I was leasing.

16   Q.  And do you see that this tax return shows the $31 and the

17   $81 that we saw earlier on your Pennsylvania 2014 tax return?

18   A.  Okay.  Yes.

19   Q.  And isn't it true that this tax return was created, signed,

20   and filed after the issue of domicile came up in this matter?

21            THE COURT:  Well, wait, wait.  Why don't we just get

22   to the date and have him adopt the date and signature?

23            MR. HUTMAN:  Sure.

24   BY MR. HUTMAN:

25   Q.  Mr. Banerjee, turn to the second page of the document.

1           Do you see that there's a signature from the tax

2   preparer with a date of November 3rd, 2018, on the second page

3   at the bottom?

4   A.   Okay.

5   Q.   And so that date, 11/3/2018, that was after the plaintiff

6   sent you document requests asking for your tax returns for the

7   year 2014; isn't that correct?

8   A.   I would imagine so, but I don't recall.

9   Q.   Well, let's just get that clear on the record.

10          Can you turn to Exhibit 48?

11          THE COURT:  Wait.  Wait before you move on.

12          Mr. Banerjee --

13          THE WITNESS:  Uh-huh.

14          THE COURT:  -- do you recall when your 2014 federal

15   income tax return was filed?

16          THE WITNESS:  To be absolutely honest, I don't recall.

17          THE COURT:  You're expected to be a hundred percent

18   honest when you're on the stand, okay?

19          Was it filed in 2018?  Is that date on --

20          THE WITNESS:  Whatever this date says, then that's

21   what it was.

22          THE COURT:  Okay.  Did you hire H&R Block to file a

23   2014 federal income tax return for you?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  You have no reason to believe that

1   anything in Exhibit 36 regarding the date or the filer or the

2   address is incorrect --

3            THE WITNESS:  No.

4            THE COURT:  -- other than the flat 547G?

5            THE WITNESS:  Correct.

6   BY MR. HUTMAN:

7   Q.  Mr. Banerjee, had there been a prior version of your

8   federal 2014 tax return that was filed before November 3rd,

9   2018?

10  A.  Not that I know of.

11  Q.  And if you could turn quickly -- we're going to come back

12  to this.  But turn quickly to Exhibit 48 --

13  A.  Forty-eight?

14  Q.  Yes.  Turn to the second page.

15           And do you see that these are the document requests

16  that the plaintiff sent you with regard to the very issue here,

17  your domicile in the years 2013 and 2014?

18  A.  Yes.

19  Q.  And if you turn to the very last page --

20           THE COURT:  Mr. Hutman, do you really need him to

21  admit to this or can you do this by affidavit?

22           MR. HUTMAN:  Thank you, your Honor.

23  BY MR. HUTMAN:

24  Q.  Going back to Exhibit 36.

25  A.  Say that again?

K33LSADH                    Banerjee - Direct

1    Q.  Going back to Exhibit 36.

2    A.  Yes.

3    Q.  You only produced to the plaintiffs the first two pages of

4    this tax return; isn't that correct?

5    A.  I don't recall.

6    Q.  Let's go to Exhibit 88.

7              THE COURT:  Mr. Hutman, before you start asking

8    questions about this, is this something that can be done by

9    affidavit?

10             MR. HUTMAN:  I don't think so your Honor.

11             THE COURT:  Okay.

12             MR. HUTMAN:  And this would also actually be a

13   sequence of questions that would be best if Mrs. Banerjee

14   weren't here.  These are documents produced by HRB after her

15   deposition.

16             THE COURT:  Okay.

17             You know what?  Mrs. Banerjee, I'm going to ask that

18   you step into the jury room, which is that door in the back of

19   the courtroom.

20             (Mrs. Banerjee exited courtroom)

21   BY MR. HUTMAN:

22   Q.  Mr. Banerjee, do you see that Exhibit 88 is a Schedule E to

23   your 2014 form 1040?

24   A.  Yes.  It's not correct, but okay.

25   Q.  Do you see that it has your name at the top of the return?

SOUTHERN DISTRICT REPORTERS, P.C.

1     A.   Yeah.

2     Q.   Have you ever seen this document before?

3     A.   No.

4     Q.   This document shows that an address of 23 Soundview Farm;

5     Weston, Connecticut as a physical address of which you were

6     claiming a loss in 2014.  Do you see that?

7     A.   I wasn't claiming anything, because this document I have

8     never see.  You have to understand, Mrs. Banerjee was the

9     person who coordinated with Walter, our tax preparer.

10    Q.   Mr. Banerjee, do you have any reason to believe that this

11    Schedule E to the form 1040 was not filed together with your

12    tax return in 2014 -- before 2014?

13    A.   I don't think this was ever filed.

14    Q.   Do you have any specific reason to believe that it wasn't

15    filed?

16    A.   First time I'm seeing it, other than when you showed it to

17    me.

18    Q.   Let's turn to Exhibit 89.  And do you see that Exhibit 89

19    is a Form 4684, to be attached to your 2014 tax return with

20    your name at the top?

21    A.   Okay.

22    Q.   And it shows theft of household items with a total of

23    88-something thousand in 2014?

24    A.   I see that.

25    Q.   You have any reason to believe that this document was not

1   filed by HRB together with your 2014 tax return?

2   A.  You just showed me my tax returns earlier.

3            Did these things appear in that, Mr. Hutman?

4            THE COURT:  Okay.  You're not asking the questions

5   here.  Time out.

6            THE WITNESS:  Because --

7            THE COURT:  Time out.  Stop.  Stop.  You're not

8   arguing with him here, okay?  You are providing sworn testimony

9   under oath.

10           All right.  Take a look at Exhibit 89, Mr. Banerjee,

11  where it says "theft of household items."  And it suggests that

12  the theft loss was somewhere on the order of anywhere between

13  80 to $95,000.  Do you see that?

14           THE WITNESS:  I do.

15           THE COURT:  Does that ring a bill at any time in 2014,

16  whether you suffered a theft or a loss of any household items

17  anywhere?

18           THE WITNESS:  Yes, your Honor.  But this is --

19           THE COURT:  Okay.  Tell me about that theft or loss,

20  everything can you remember.

21           THE WITNESS:  Because in the Connecticut house, which

22  did not belong to me any longer, because I had signed it over

23  to my wife --

24           THE COURT:  I asked you a very specific question.  I

25  want to get through what we can get through today.

1          Tell me everything you remember about the theft or

2    loss of household items that appears to be reported on Exhibit

3    89.

4          THE WITNESS:  So we had a burglary in that house in

5    Connecticut sometime in 2014.  I can't exactly -- I don't

6    exactly remember when.

7          THE COURT:  Which season?

8          THE WITNESS:  Fall.

9          THE COURT:  How did you find out about it?

10         THE WITNESS:  So my wife, I believe, had traveled to

11   the house with the kids and basically saw a whole bunch of

12   items missing from the house.

13         THE COURT:  Okay.  Who made a police report?

14         THE WITNESS:  She did.

15         THE COURT:  When?  When she found out?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  Tell me everything else you

18   remember about the theft.  How did you find out?

19         THE WITNESS:  I don't think I was in the country at

20   that time, so I believe she called me or something and told me

21   about -- I really don't remember.  I just -- all I know is that

22   there was a whole bunch of items that were stolen from the

23   house.

24         THE COURT:  What types of things were stolen?

25         THE WITNESS:  Our wedding china, a whole bunch of

K33LSADH                      Banerjee - Direct

1    kitchen equipment stuff, wine glasses -- it was just a huge

2    list of items that were missing.

3           THE COURT:  Who made a huge list of items that were

4    missing?

5           THE WITNESS:  She did.

6           THE COURT:  When you say "she," you're pointing

7    towards the jury room where Mrs. Banerjee is right now?

8           THE WITNESS:  Yes.

9           THE COURT:  Okay.  Did you ever verify or come to see

10   for yourself what was missing?

11          THE WITNESS:  Other than what she told me.  Remember,

12   we weren't exactly on friendly terms, your Honor.

13          THE COURT:  I understand that.  I am trying to cabin

14   this to the facts about how did you come --

15          THE WITNESS:  So --

16          THE COURT:  Stop.  Stop.

17          So your testimony is that you came to hear about this

18   because she called you.

19          Did she call you the day she found out or later?

20          THE WITNESS:  I'm sure she did.

21          THE COURT:  Okay.  When was the next time you were in

22   the house to see if the house had been burglarized?  I'm not

23   saying that that was the purpose you were there.

24          But when was the next time you were there, if you

25   recall?

1          THE WITNESS:  I want to say sometime in November of

2     that year -- end of the year, around that time.  I was in

3     India.  I came back in November.

4          THE COURT:  Okay.  But you didn't come back -- that

5     time you came back in November, it wasn't because she told you

6     about the burglary and you immediately had to come and see.

7          THE WITNESS:  No.

8          THE COURT:  Okay.  When you came back in November, did

9     you do a walk-through or a look-around the house to see if --

10    to make your own list or assessment of what was lost?

11         THE WITNESS:  I don't think so.  I took her word for

12    it.

13         THE COURT:  Okay.  And so you also took her word for

14    it as to the approximate value of everything that was lost?

15         THE WITNESS:  I believe so, because she was carrying

16    home insurance.

17         THE COURT:  Okay.  Was there a claim made to the home

18    insurance?

19         THE WITNESS:  Yes.

20         THE COURT:  And she made the claim?

21         THE WITNESS:  Yes.

22         THE COURT:  You have no knowledge of the claim?

23         THE WITNESS:  Not --

24         THE COURT:  You didn't sign any documents for the

25    claim?

1          THE WITNESS:  No.  Not that I recall.  I really can't

2     remember.

3          THE COURT:  Was there any jewelry that was missing?

4          THE WITNESS:  I don't remember.

5          THE COURT:  So you said "wedding china, kitchen

6     equipment, wine glasses, it was a huge list."

7          What do you mean by "kitchen equipment?"

8          THE WITNESS:  So we had baccarat wine glasses, very

9     expensive china that was missing.  Then there was -- it was a

10    big list.  I really -- there was Cuisinarts and stuff.  I do

11    remember my daughter's kitchen set; it was sort of expensive as

12    well.  Rugs.  They were basically silk rugs.

13         THE COURT:  Were there any electronics that were

14    stolen?

15         THE WITNESS:  I can't recall.  I think there may have

16    been a TV.

17         THE COURT:  How did the thieves gain entry into the

18    house?

19         THE WITNESS:  So I believe she was getting some work

20    done, and then the thieves basically left the door open.

21         THE COURT:  The thieves left the door open?

22         THE WITNESS:  It was a big house, so one of the doors

23    -- that's what I think; we don't know for sure -- was left

24    open, and then they later came out and came back and cleaned up

25    the house.

1              So I believe what the theory was the cops in

2    Connecticut looked at all the various places that they normally

3    look for, they couldn't really find anything.

4              THE COURT:  So there was no sign of forced entry then?

5              THE WITNESS:  There was no sign of forced entry.

6              THE COURT:  Okay.  And the cops were called?

7              THE WITNESS:  Oh, yeah.

8              THE COURT:  Okay.  Was there anything vandalized or

9    broken inside the house?

10             THE WITNESS:  I don't recall.

11             THE COURT:  But by the time you went back in November,

12   you didn't notice if there was anything broken or vandalized in

13   the house?

14             THE WITNESS:  I don't recall.  Yeah.  I really don't.

15             THE COURT:  And you don't remember whether your wife

16   told you if she had noticed anything broken or vandalized,

17   right?

18             THE WITNESS:  There was a lot of outside stuff missing

19   first, like on the deck.

20             THE COURT:  Okay.  Can you answer my first question?

21             THE WITNESS:  Okay.  No, I don't recall if she said

22   what was vandalized or not.

23             THE COURT:  Okay.  What was the outside stuff that was

24   missing?

25             THE WITNESS:  So there were some expensive, very like

1    heavy iron parts and stuff that we had outside.  That was

2    missing.

3              THE COURT:  When you say "pots" --

4              THE WITNESS:  Pots like flowerpots, but they were big

5    and heavy.

6              THE COURT:  Planters?

7              THE WITNESS:  Planters.

8              And I believe she mentioned something -- I vaguely

9    recollect that light fixtures were also taken from the outside.

10             THE COURT:  When you say "light fixtures were taken

11   from the outside," what do you mean?

12             THE WITNESS:  Like deck lighting, which is a nice --

13   whatever -- lamp or whatever it is.

14             THE COURT:  Like an electric lamp?

15             THE WITNESS:  Yes.  It's on the house.  It's fixed

16   into the house.  So they got a couple of those as well.

17             THE COURT:  And when you came back in November, those

18   light fixtures -- exterior light fixtures were still missing?

19             THE WITNESS:  I believe so.  That's what I recollect.

20   It's been a long time.

21             THE COURT:  And there was a homeowner's insurance

22   claim made; is that right?

23             THE WITNESS:  That's what I understand.

24             THE COURT:  Did you have any conversations or have to

25   sign or file any documents in connection with the homeowner's

1    claim?

2              THE WITNESS:  I really don't recall, your Honor.

3              THE COURT:  Okay.  All right.  Go ahead, Mr. Hutman.

4    BY MR. HUTMAN:

5    Q.  Mr. Banerjee, all these items that were stolen from the

6    house, does that mean that the house was furnished at the time

7    the thieves broke in?

8    A.  Yes.

9    Q.  I want you to turn to Exhibit 90, which is another document

10   that was produced by HRB.

11             Mr. Banerjee, do you recognize that this is a 2014

12   Form 5498 for an IRA contribution?

13   A.  Okay.

14   Q.  And it has your name on it with 304 Harvester Circle;

15   Pittsburgh, Pennsylvania address?

16   A.  Yes.  This is all in the fidelity accounts, which I had

17   pretty much given my wife carte blanche ownership over.

18   Q.  And was the information related from this form, your IRA,

19   incorporated in your 2014 1040 tax return?

20   A.  I don't know.  HRB was given all this, I guess.  I don't

21   know.

22   Q.  Do you have any reason to believe that this form, Exhibit

23   90, isn't accurate and wasn't --

24             Do you have any reason to believe that this form isn't

25   accurate?

1   A.  I don't have any reason to believe it's not accurate.

2   Q.  Do you have any reason to believe that it wasn't

3   incorporated in your 1040 tax return?

4   A.  I don't know.

5   Q.  And the 23 Soundview Farmhouse, that was also the property

6   that was listed as the location of the home office in the 2013

7   joint tax return for ZBAC, LLC; is that correct?

8   A.  That's what you showed me.  I think you have my answer on

9   the record.

10  Q.  And let's turn to Exhibit 10.

11  A.  Ten.  Okay.

12  Q.  And, Mr. Banerjee, do you recognize that the document

13  marked as Exhibit 10 is a request for the release of a judgment

14  lien that was filed by you on September 22, 2014, in the

15  district of Massachusetts?

16  A.  I don't think I was in the country around that time.  So if

17  you see -- again, my wife signed my name --

18          THE COURT:  Objection.  Nonresponsive.

19          Let me ask the question again, Mr. Hutman.

20          And, Mr. Banerjee, I want to ask you to please -- I

21  want to direct you to answer Mr. Hutman's question without your

22  lengthy preface:  I was not in the country at the time.  Okay?

23  I understand that is your position.  Okay?

24          THE WITNESS:  Okay.

25          THE COURT:  But please answer Mr. Hutman's question,

1   because we don't have that much time left today.

2            THE WITNESS:  Okay.

3            THE COURT:  Now, let's get through this.

4            I'm sorry, Mr. Hutman.  Please ask your question

5   again.

6            MR. HUTMAN:  Thank you, your Honor.

7   BY MR. HUTMAN:

8   Q.  Mr. Banerjee, do you recognize that Exhibit 10 is a request

9   for the release of a judgment lien that you filed on September

10  22nd, 2014, in the district of Massachusetts?

11  A.  Yes.  I see it.

12  Q.  And this was a request to release the lien on the 23

13  Soundview Farm Road house in Weston, Connecticut; is that

14  correct?

15  A.  Correct.

16  Q.  And that was the same house that was burglarized, correct?

17  A.  Correct.

18  Q.  Now let's turn to Exhibit 43 -- sorry -- 46.

19  A.  Mr. Hutman, can I make a point here?

20            THE WITNESS:  Or am I not allowed to, your Honor?

21            THE COURT:  No.  Let's move through this direct.

22            You can make a note of that, and if it's something you

23  think is important, you can raise it on your responsive case.

24  However, I am going to make sure what your testimony and the

25  testimony you elicit of others is not duplicative of things

1    that you have already said in this court.  Okay?

2             THE WITNESS:  Yes.

3             THE COURT:  I know what your position is.  I want

4    specific facts tied to documents.  I want precise answers to

5    questions.  Okay?

6             THE WITNESS:  I understand, your Honor.

7             Can I just ask another question, your Honor?

8             THE COURT:  Uh-huh.

9             THE WITNESS:  So if you notice that in the exhibit Mr.

10   Hutman was pointing to, right, it says:  "A copy of the release

11   can be mailed to Akshita Banerjee at 304 Harvester Circle."

12            My address is still in there because I could not

13   physically --

14            THE COURT:  I see that on the document.  Also, Mr.

15   Banerjee, this is what I'm talking about, okay?  I can read.  I

16   can see that that's what it says.  You can make your arguments

17   about what that means in separate briefing.

18            THE WITNESS:  Got it.  Okay.

19            THE COURT:  Okay?  We are not --

20            THE WITNESS:  Okay.

21            THE COURT:  -- getting into that on the record here.

22            THE WITNESS:  Okay.

23            THE COURT:  I have another question though on Exhibit

24   10.

25            Is that your signature on Exhibit 10?

K33LSADH                    Banerjee - Direct

1              THE WITNESS:  No, it's not, your Honor.

2              THE COURT:  Whose signature is it?

3              THE WITNESS:  It's my wife's.

4              THE COURT:  Did she do this with your knowledge?

5              THE WITNESS:  Yes.  She said something about the:

6    Weston house would not do anything without your name appearing,

7    so I have to sign on your behalf since you're not here.

8              THE COURT:  Okay.  All right.

9              Mr. Hutman, please move on.

10   BY MR. HUTMAN:

11   Q.  Mr. Banerjee, let's look at Exhibit 46.

12   A.  Yes.

13   Q.  Mr. Banerjee, do you recognize Exhibit 46 as the joint 2015

14   tax return filed on behalf of you and your wife in Pittsburgh

15   -- in Pennsylvania?

16             THE COURT:  Mr. Hutman, where are you going with this?

17             Don't answer this question.

18             Why can't this be authenticated in an affidavit on

19   your part?

20             MR. HUTMAN:  I wanted him to authenticate it, but I'm

21   fine.  I really wanted to establish the address because I had a

22   followup question, a short sequence of questions.

23             THE COURT:  Okay.  Go ahead.

24   BY MR. HUTMAN:

25   Q.  Mr. Banerjee, this is your 2015 Pennsylvania tax return,


                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

1   filed jointly on behalf of you and your wife in Pennsylvania;

2   is that correct?

3   A.  Yes.

4   Q.  And the address on this joint tax return for 2015 is also

5   1514 Cook School Road; Pittsburgh, Pennsylvania; is that

6   correct?

7   A.  Yes.

8   Q.  And this tax return was filed on October 14th, 2018, on

9   page two; is that also correct?

10  A.  Yes.  I see it.

11  Q.  Mr. Banerjee, isn't it the case that all of the tax returns

12  filed by you or jointly with your wife on behalf of you between

13  the years 2013 and 2015 show a Pennsylvania address, except for

14  your 2014 federal tax return?

15  A.  I think you have my answer on the record.

16  Q.  I don't.

17         THE COURT:  Mr. Banerjee, would you please answer the

18  question?

19         THE WITNESS:  The address that it shows, again, was

20  not authorized by me.

21  BY MR. HUTMAN:

22  Q.  That wasn't the question.  I'm going to ask the question

23  again.

24         Mr. Banerjee, isn't it true that with the exception of

25  your federal 2014 return, every other return filed on your

1   behalf between the years 2013 and 2015 show a Pennsylvania

2   address?

3   A.   And I'll answer it again.  If the address could show

4   Pennsylvania --

5            THE COURT:  Mr. Banerjee, I'm going to strike that

6   answer as nonresponsive.  It's a yes-or-no question.

7            THE WITNESS:  Okay, your Honor.  Okay.  Yes.

8            MR. HUTMAN:  Thank you.

9   BY MR. HUTMAN:

10  Q.   And isn't it true that of all those tax returns, the last

11  one filed, the latest in time, was that 2014 United States

12  federal tax return in November of 2018?

13  A.   They were filed in 2018.  Is that what you're saying?

14  Q.   My question was:  Was your 2014 federal return the

15  last-in-time tax return to be filed of the tax returns that

16  were filed on your behalf for the years 2013 through 2015?

17  A.   I'm still not following your question.

18            THE COURT:  Mr. Hutman, do you really need an answer

19  to this question?

20            MR. HUTMAN:  All right.  So let me try and approach

21  this --

22            THE COURT:  Again, you don't have a jury here, okay?

23            MR. HUTMAN:  I know.  I have a very specific thing

24  that I'm aiming at here.

25  BY MR. HUTMAN:

1   Q.  Isn't it true, Mr. Banerjee, that it was only after

2   plaintiff asked for your tax returns that you specifically

3   asked your accountant to create one with an Indian address?

4   A.  That would have always been created if I was in charge of

5   those taxes.  But that's where I resided.

6           THE COURT:  Mr. Hutman, do you see where this is

7   going?

8           MR. HUTMAN:  Yes.

9           THE COURT:  I told you before, you know the answers

10  he's going to give.  It is going to be up to me to judge

11  credibility.  You can point to the documents.  They have dates

12  on them.  You can file an affidavit, if you haven't already,

13  identifying where you got them.  I can make my own judgments,

14  right?  And I can figure out what the dates mean.

15          So figure out what you need from Mr. Banerjee, what

16  admissions you need from him that you can't otherwise get.  I'm

17  going to suggest that that is actually a very small amount

18  because you have a lot of documents.  You had to get them from

19  other sources.  Okay?

20          Again, you're not before a jury, so you don't need to

21  -- and you will have the opportunity for post-hearing briefing

22  where you can put this altogether in a story that you can tell

23  me, okay?

24          MR. HUTMAN:  Okay.

25  BY MR. HUTMAN:

1  Q.  Mr. Banerjee, can you turn to Exhibit 93.

2          MR. HUTMAN:  You know what?  I think I'll do this for

3  Mrs. Banerjee.

4          THE COURT:  Okay.

5          MR. HUTMAN:  Get it from a different source.

6          THE COURT:  Okay.

7  BY MR. HUTMAN:

8  Q.  Let's look at Exhibit 57.

9  A.  Not 93?

10  Q.  Not 93.  I'm sorry.  Exhibit 55.

11  A.  Okay.

12  Q.  Mr. Banerjee, do you recognize Exhibit 55 as account

13  information for one of your fidelity accounts?

14  A.  Okay.

15  Q.  And if you turn to the second page -- sorry, the third

16  page -- it has a date at the bottom that says "April 25th,

17  2011."

18  A.  Page three of four?

19  Q.  Yes.

20  A.  Okay.

21  Q.  And this document from 2011 shows your residential address

22  as 23 Soundvie Farm in Weston, Connecticut, doesn't it?

23  A.  This document was from when, Mr. Hutman?

24  Q.  It says from fidelity.com, and it shows rollover IRA at the

25  top.

1   A.   Okay.  I mean, I don't see where the date is.

2   Q.   The date is on page three of four towards the bottom.

3   A.   Okay.  I see it.  1/26/2011?

4   Q.   4/26.

5   A.   Okay.

6   Q.   And this information that you put into your account as of

7   that date of 4/26/2011?

8   A.   I don't know.

9   Q.   Do you have any reason to believe this isn't the

10  information that you put into your account for fidelity on

11  April 26th, 2011?

12  A.   I think this was -- this sort of preexisted before we left

13  for India in 2009, and nothing changed in it.  Because my

14  occupation still says "chief investment officer."  I wasn't in

15  2011.  So...

16  Q.   Can you turn back to Exhibit 54.

17          Isn't it true, Mr. Banerjee, that Exhibit 54 is the

18  information that was on this account on your fidelity account

19  prior to 2011?

20  A.   Yeah.  That's what I -- I mean, I believe that's what I

21  think.  And --

22  Q.   This document shows your employer as Tuckerbrook

23  Alternative Investments and your occupation as fund manager?

24  A.   Yeah.  And I think when we separated from -- or I separated

25  from Tuckerbrook, my wife probably has changed everything on

1    this to the other form.  The way that it works -- and you can

2    confirm it with my wife; and she's not even here -- but all

3    these accounts, she typically takes care of it.  I just don't

4    have the time to take care of all this stuff.  And it's not a

5    lot of money.

6    Q.  What do you mean when you say "it's not a lot of money?"

7    A.  It wasn't -- this wasn't like a huge sum of money that I

8    needed to keep.  It's $2500, Mr. Hutman.

9    Q.  Okay.  Let's look at Exhibit 57.

10            Mr. Banerjee, do you recognize Exhibit 57 as a

11   statement from fidelity investments for you for the period of

12   January 1/20/2013 through January 31st, 2013?

13   A.  Yes.  Yes.

14   Q.  If you turn to page three of the document --

15   A.  Three of eight?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Do you see where it says "deposit" on the bottom third of

19   the page?

20   A.  Okay.

21   Q.  And it says "wire transfer from bank?"

22   A.  Okay.

23   Q.  What bank is that wire transfer from?

24   A.  As I said, you have to ask my wife, because I have turned

25   over all control and the ownership, everything as part of our

1    separation to her in 2012.  So everything that's here, you have

2    to ask her, because she is transferring money, she's using the

3    money, whatever it is.  I had no control over it.

4    Q.  You didn't answer the question.  The question was:

5         What bank is that from?

6    A.  I have no idea.  You have to ask her.

7    Q.  Mr. Banerjee, did you have any bank account in the United

8    States that this transfer could be from?

9    A.  No.

10   Q.  Let's turn to Exhibit 66.

11        Mr. Banerjee, do you recognize Exhibit 66 as a

12   statement for fidelity Investments with your name on it and a

13   Pittsburgh address for February of 2014?

14   A.  I see it but I don't recognize it because I haven't seen

15   it.

16   Q.  Mr. Banerjee, are you claiming that your wife changed the

17   address -- strike that.

18        Do you recall, Mr. Banerjee -- we saw this a few

19   minutes ago -- that the address in 2011 on your account was 23

20   Soundview Farm in Weston, Connecticut?

21   A.  Yes.

22   Q.  And here on this statement, 2014, for January of 2013, it

23   shows a Pittsburgh address; isn't that correct?

24   A.  Correct; because she moved to Pittsburgh.

25   Q.  Is it your claim that she changed the address but didn't

1   change the name on the account?

2   A.  Yes.

3           MR. HUTMAN:  How much more time do we have,

4   your Honor?

5           THE COURT:  Fifteen to 20 minutes.

6           THE WITNESS:  Your Honor?

7           THE COURT:  Yes.

8           THE WITNESS:  Can I say something?

9           This is inherently not fair to me that I have to come

10  back to New York again because Mr. Hutman takes -- I mean, all

11  we have done is this tax stuff for this entire three hours.

12          THE COURT:  You know what?  He's entitled to do this

13  because you have placed your domicile at issue.  And my primary

14  purpose here is to assess your credibility, and now that we've

15  placed it at issue, Mrs. Banerjee's credibility.  Okay?

16          THE WITNESS:  Yes.

17          THE COURT:  So you are here.  I mean, the other

18  potential route, if you want to talk about it -- I can happily

19  refer you to a different magistrate judge -- is whether you

20  want to talk about whether you want to continue fighting about

21  your domicile or whether you want to admit that your domicile

22  was not India at the time that this lawsuit was filed.

23          THE WITNESS:  Absolutely not.  My domicile was India.

24          THE COURT:  Okay.  All right.  Then here we go.  I am

25  trying to assess credibility here, okay?  I am telling Mr.

1    Hutman to move on.

2              You have fifteen to 20 minutes.  Okay?

3              THE WITNESS:  Yeah.

4              THE COURT:  But you are going to get time to put your

5    case on too.  And I am also going to do a similar limiting

6    exercise, because much of this issue can be shown on the

7    papers, on the documents.  My primary reason to have you in

8    here is to assess credibility.

9              THE WITNESS:  Right.  Yeah.

10             THE COURT:  Okay?

11             THE WITNESS:  Yeah.

12             THE COURT:  So, Mr. Hutman, again, think about

13   statements that you really need under oath from either Mr.

14   Banerjee or Mrs. Banerjee that you don't already have.  Again,

15   assume that Mr. Banerjee is going to take whatever is on the

16   document and say something along the lines of what he's said so

17   far.  Okay?

18             MR. HUTMAN:  I understand, your Honor.

19             I want the Court to have the ability to assess his

20   credibility in making those types of statements when faced with

21   the documents.

22             THE COURT:  I have had a couple of hours of doing that

23   now.  So now move on from credibility.  And what are specific

24   factual admissions that you think are necessary at this point?

25             MR. HUTMAN:  Okay.

1          THE COURT:  Okay.  And I want to give you like 15

2     minutes, because I may have a few questions of my own after

3     that, okay?  Just a few questions.

4          THE WITNESS:  So just to follow up, your Honor, this

5     fidelity stuff, I mean, we've covered this in depositions.  We

6     covered it in affidavits.  It's in a separation agreement that

7     has already been turned over.  And we keep on with the same

8     questioning over and over again.

9          THE COURT:  Mr. Banerjee, I already told Mr. Hutman

10    that he has 15 more minutes.  I have a couple minutes of

11    questions of my own.

12         THE WITNESS:  Okay.

13         THE COURT:  We will set another date for a followup

14    evidentiary hearing, at which point, Mr. Hutman can finish what

15    he needs to finish.

16         But during that time, in the interim, Mr. Hutman,

17    you're directed to really pare down what you're going to ask

18    Mr. Banerjee, okay?  Assume that Mr. Banerjee would have told

19    his wife everything that's happened even if you don't have a

20    transcript already.  Assume that, you know, you're going to get

21    answers in the vein that you've gotten them all morning, okay?

22         THE WITNESS:  Will I get equal time, your Honor?

23         THE COURT:  It's not about equal time.  It's about

24    eliciting the facts.  This has moved much more slowly than I

25    expected because I did not expect to be going over every single

K33LSADH                    Banerjee - Direct

1   document as if it were a deposition.  Okay?  I really want --

2            Mr. Hutman, you're the lawyer in the room.  I really

3   want you to streamline this, okay?

4            And what this also means, Mr. Banerjee, is that when

5   it's your turn, I'm not going to give you a platform to just

6   say everything -- recite everything that was in your affidavits

7   or in any prior statements to the Court.  Okay?

8            THE WITNESS:  Okay.

9            THE COURT:  I want it to be very directed.  I will cut

10  you off and ask you specific questions just like I did earlier.

11           THE WITNESS:  Sure.

12           THE COURT:  But that is in an attempt to get

13  particular facts that I think I need to hear --

14           THE WITNESS:  Okay.

15           THE COURT:  -- and understand, okay?

16           MR. HUTMAN:  I understand, your Honor.

17           I'm trying to move as quickly as I can.  The answers

18  are often evasive, and it makes it difficult.  Some of the

19  documents we never had before in depositions, so I apologize.

20           THE COURT:  Okay.

21  BY MR. HUTMAN:

22  Q.  Mr. Banerjee, you were ticketed three times in Pennsylvania

23  between the years 2013 and 2016 for driving violations; is that

24  correct?

25  A.  I was ticketed once in 2013 and I believe once in 2015, and

K33LSADH                    Banerjee - Direct

1   once in 2016, if I recall correctly.

2   Q.  And in all of those instances, you gave your home address

3   to the officer of the court as Pennsylvania, didn't you?

4   A.  No.  I gave my license, which is what typically an officer

5   asks for, and registration.  And the registration on the card

6   was my father-in-law's address, because it was his car that I

7   was driving.

8   Q.  And you also got into a dispute with a Mr. Robert Schiff in

9   Pittsburgh in relationship with the work that he had done on

10  the Cook School house; isn't is that correct?

11  A.  It really wasn't my dispute.  It was my wife's house.  I

12  was helping her because she had just started a new job and she

13  had asked me to supervise the work because I was visiting

14  Pittsburgh.  I think I had said I visited Pittsburgh maybe a

15  week at a time, because I was staying with my cousin.  And

16  there's only so much you can stay with your cousin.  And so it.

17  Was over that period of time that I supervised Mr. Schiff, and.

18  My wife felt that the work he was doing was absolutely subpar

19  and she fired him.

20  Q.  Mr. Banerjee, I'll ask you to keep your answers short and

21  actually answer the question, because I have very limited time

22  and I want to get through this quickly.

23       Mr. Schiff sued you and your wife for not paying him

24  for the work on the Cook School house; isn't that correct?

25  A.  That's correct.  And she counterclaimed by putting my name

K33LSADH                    Banerjee - Direct

1    on it.

2    Q.  And you and your wife filed a counterclaim against

3    Mr. Schiff, right?

4    A.  Correct.

5    Q.  And your wife got your permission to file that counterclaim

6    on behalf of the two of you with respect to Mr. Schiff; isn't

7    that correct?

8    A.  I don't recall exactly.

9            THE COURT:  Well, I want to stop here.

10           THE WITNESS:  Yeah.

11           THE COURT:  So there was a counterclaim, and you and

12   your wife were both parties in the counterclaim; is that right?

13           THE WITNESS:  So --

14           THE COURT:  Yes or no?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  Were either of you represented by

17   counsel in this dispute?

18           THE WITNESS:  No.

19           THE COURT:  And this was in state court?

20           THE WITNESS:  This was in magistrate court, actually.

21   A local --

22           THE COURT:  But not federal court?

23           THE WITNESS:  No.

24           THE COURT:  Okay.  Mr. Hutman, go on please.

25   BY MR. HUTMAN:


SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K33LSADH                     Banerjee - Direct

1    Q.  And in your counterclaim, you had your address listed as

2    3074 Harvester Circle, Pittsburgh, and then later after the

3    move occurred, 1514 Cook School Road; isn't that correct?

4    A.  Mr. Hutman, I told you that my wife signed all the

5    documents and she --

6            THE COURT:  Mr. Banerjee, this is your last warning.

7    Answer the question.

8            THE WITNESS:  I'm answering the question.

9            THE COURT:  No.  "Isn't that correct?"  So it's yes or

10   no, okay?  No more prefacing with explanations.  I understand

11   what your explanation is going to be.  I've heard it several

12   times today.  I don't need the explanation, I need the answer

13   under oath.

14           THE WITNESS:  She signed my name.

15   BY MR. HUTMAN:

16   Q.  You gave her permission to sign your name; isn't that

17   correct?

18   A.  I learned about it afterwards.

19           THE COURT:  Please move on, Mr. Hutman.

20   BY MR. HUTMAN:

21   Q.  Mr. Banerjee, you never told the court in Pennsylvania that

22   there should be no claim against you, because it wasn't your

23   house, did you?

24   A.  I was asked to show up to the --

25   Q.  It's a yes-or-no question.

K33LSADH                    Banerjee – Direct

1            THE COURT:  Mr. Banerjee, yes or no?

2            THE WITNESS:  No.  Whichever one, I don't know.

3            MR. HUTMAN:  I'm going to ask the question again.

4   BY MR. HUTMAN:

5   Q.  Mr. Banerjee, you never told the court in Pennsylvania that

6   there should be no claim against you for Mr. Schiff because it

7   wasn't your house?

8   A.  It wasn't my house, yes.  But there shouldn't be anything

9   -- I wasn't represented by counsel, neither was she.

10  Q.  Please answer the question.

11  A.  No.

12  Q.  Mr. Banerjee, isn't it true that you never told the court

13  in Pennsylvania that there should be no claim against you

14  because it wasn't your house in Pennsylvania that he was

15  working on?

16  A.  Yes.

17  Q.  And the court ultimately found against you and your wife,

18  and in favor of Mr. Schiff, didn't it?

19  A.  Yes.

20  Q.  Now, when you were in the United States in 2013, you

21  created a corporation called Crossway Yield Partners; isn't

22  that true?

23  A.  Yes.

24  Q.  And the purpose of that corporation was to purchase

25  investment property in the United States for your family trust

1   in India; isn't that true?

2   A.   Correct.

3   Q.   And in 2013, you got involved with a Pittsburgh charitable

4   organization called the Forbes Fund; isn't that true?

5   A.   Yes.

6   Q.   And you joined the Forbes Fund advisory board in

7   Pittsburgh, Pennsylvania in 2014; isn't that true?

8   A.   Towards the end of 2014, I believe.

9   Q.   And another Pittsburgh business organization called the MIT

10  Enterprise Form Pittsburgh branch also placed you on their

11  board of directors in 2014; isn't that true?

12  A.   I don't know.  I never joined it.

13  Q.   Did they place you on their board of directors?

14  A.   They wanted me to join it.  They asked me to pay some

15  money.  And I didn't find the utility in it.

16  Q.   You attended some MIT Enterprise Forum business networking

17  events in 2013 and 2014, correct?

18  A.   Yes.

19  Q.   Who is Steve Cherwin?

20  A.   Probably one of the members.  I remembering vaguely.  I

21  don't know if he was a board member or not.

22  Q.   And the Pittsburgh branch of the MIT business Forum has

23  since been renamed the Pittsburgh Entrepreneurs Forum; is that

24  correct?

25  A.   I don't know.

K33LSADH                       Banerjee - Direct

1    Q.  Now, Crossway, that wasn't a Pennsylvania entity, was it?

2    A.  No.

3    Q.  And we had seen that on your 2013 tax returns there was a

4    reference to a loss related to a Pennsylvania entity; isn't

5    that correct?

6    A.  Yeah.  We saw it.  I have no idea.

7    Q.  But that can't be Crossway because Crossway wasn't a

8    Pennsylvania entity right?

9    A.  No.

10   Q.  And isn't it true that you were also at some point in time

11   involved with an entity called Harvester Energy, LLC?

12   A.  My wife had asked me to help out, and I said no.

13             THE COURT:  You said no?

14             THE WITNESS:  I said no.

15   BY MR. HUTMAN:

16   Q.  And isn't it true that you're also involved in an entity

17   with your wife called SSA Capital Advisors?

18   A.  No.

19   Q.  Were you involved in an entity called SSA Capital Partners

20   I, LLC?

21             THE WITNESS:  Excuse me, your Honor.  I have to

22   interject, because Mr. Hutman is, again, going to this issue of

23   the 2016 -- post-2016.

24             MR. HUTMAN:  I haven't --

25             THE WITNESS:  Because 2017 tax returns were produced

K33LSADH                    Banerjee - Direct

1    by mistake by HRB.  And this is my wife's business.  He did not

2    have authorization.

3               THE COURT:  You will answer the question.  I find that

4    this goes to credibility.  You will answer the question.  You

5    will not interject any more explanations.  I find that they're

6    very self-serving.  They're not adding anything new to the -- I

7    already know what you're going to say.

8               THE WITNESS:  But this is on the record, your Honor,

9    that's why I'm trying to stop this.

10              THE COURT:  Everything is on the record.  Answer the

11   question, please.

12   BY MR. HUTMAN:

13   Q.  Mr. Banerjee, do you have involvement in SSA Capital

14   Partners I, LLC?

15   A.  No.

16   Q.  Mr. Banerjee, isn't it true that you have a an SSA Capital

17   Advisors email address?

18   A.  My wife sends me --

19              THE COURT:  Yes or no is the answer.

20              THE WITNESS:  Yes.

21              THE COURT:  Thank you.

22              Move on, Mr. Hutman.

23   BY MR. HUTMAN:

24   Q.  What year was SSA Capital Advisors started?

25   A.  You have to ask my wife.  I don't recall.

1    Q.  Isn't it true that it was started in 2014?

2    A.  I don't know.

3              THE COURT:  Mr. Hutman, you have about two more

4    questions for today.

5    BY MR. HUTMAN:

6    Q.  Mr. Banerjee, since the year 2012, have you ever filed an

7    individual Indian tax return?

8    A.  I have no need to.

9              THE COURT:  Why not?

10             THE WITNESS:  Because the distributions I get from the

11   trust in India are all structured as loans by my mother who's

12   the trustee.

13             THE COURT:  Did you receive any advice from any

14   counsel -- whether American, Indian or otherwise -- to come to

15   this understanding?

16             THE WITNESS:  Yes.  I've talked to accountants both

17   here and over in India.

18             THE COURT:  On this issue?

19             THE WITNESS:  On this issue.

20             THE COURT:  Okay.  Who are the accountants you spoke

21   to here?

22             THE WITNESS:  HRB.  And they said a loan is not

23   income.

24             THE COURT:  Who at HRB did you speak to about this

25   issue?

SOUTHERN DISTRICT REPORTERS, P.C.

1              THE WITNESS:  Walter.

2              THE COURT:  And when?

3              THE WITNESS:  I can't remember.  But it was sometime

4     around 2014, '15, '16.

5              THE COURT:  And when you sought advice from Walter at

6     HRB in 2014 and 2015, did you do so by email, by phone, by

7     face-to-face conversation, or some other way?

8              THE WITNESS:  I'm going to correct myself.

9              When I first met Walter was actually 2016, when I had

10    moved to the U.S.

11             THE COURT:  So who did you speak to in 2014 and 2015

12    in the U.S. to get advice?

13             THE WITNESS:  I did not.  I did not.  I mean, it was

14    represented to me that it is not income.

15             THE COURT:  Represented to you by who?

16             THE WITNESS:  By Indian tax accountants.  That's how a

17    loan is structured, usually.

18             THE COURT:  All right.  Mr. Hutman, I'm going to cut

19    you off for now.

20             I have a couple questions right now for you, Mr.

21    Banerjee.

22             THE WITNESS:  Sure.

23             THE COURT:  I'd like very quick answers.

24             THE WITNESS:  Sure.

25             THE COURT:  And then we're going to schedule our next

K33LSADH                    Banerjee - Direct

1    hearing.

2              Which exhibit is the separation agreement?

3              MR. HUTMAN:  Twelve -- sorry.  My mistake.  No.  It's

4    six.

5              THE WITNESS:  I think it's six, your Honor.

6              THE COURT:  Okay.

7              MR. HUTMAN:  I apologize.

8              THE COURT:  Mr. Banerjee, who drafted Exhibit 6?

9              THE WITNESS:  My wife gave it to me to sign.  I don't

10   know.

11             THE COURT:  Did you talk to any legal counsel or

12   advisor before you signed Exhibit No. 6?

13             THE WITNESS:  No.  I read it.  I mean, so it was fine

14   to me.

15             THE COURT:  But you don't have a legal degree, right?

16             THE WITNESS:  No.

17             THE COURT:  And you don't have -- and Mrs. Banerjee

18   doesn't have a legal degree either?

19             THE WITNESS:  (Negative Nod)

20             THE COURT:  Did you talk to any lawyers who may have

21   been working for Mrs. Banerjee to get advice on Exhibit No. 6?

22             THE WITNESS:  I didn't talk to anybody.  I understand

23   she talked to a couple lawyers who helped her.

24             THE COURT:  Did you talk to anybody -- lawyer or not,

25   formally or informally, officially or on an unpaid basis -- to

1   get any advice about what Exhibit 6 meant or whether you should

2   sign it?

3            THE WITNESS:  No.  Not really, because I read it.  It

4   all seemed fine to me.  I just wanted out.  And I wanted to go

5   back to India and continue on with my business.

6            THE COURT:  Okay.  You said "no," and then you said

7   "not really."  Which one is it?

8            THE WITNESS:  No.  I didn't talk to anybody for

9   advice.

10            THE COURT:  Well, did you talk to anybody about the

11   separation agreement?

12            THE WITNESS:  I talked to my father-in-law.  I talked

13   to -- I'm trying to remember.  I talked to my mother, you know,

14   vaguely.  I didn't give her really the divorce or the -- she

15   would have gotten really worried.  So I told her that there was

16   this issue and I'm moving back to India -- or rather, I'm

17   coming back soon.  I was traveling around that time in 2012.

18   She had already moved with the kids, which was probably the

19   first sign of it.  And then I was in Connecticut in 2012 over

20   the summer for a little bit.  And that's when she handed me

21   this agreement to sign.

22            THE COURT:  Around when did she hand the agreement to

23   you to sign?

24            THE WITNESS:  I think the date on this says June 19th.

25   She may have given it to me either that day, before or the day

1      -- I don't recall.  But right around that time I reviewed it.

2              I didn't really find anything troublesome in this.

3      She wanted all the assets.  At that point I had said that we'll

4      discuss it if you file it in divorce court.  Later on she

5      impressed upon me that all the assets in India were mine and

6      that that she would have no claim on it anyway, so why wouldn't

7      I give her the U.S. assets, which were a fraction of what was

8      in India.

9              THE COURT:  Now, I have a question.  Do you have

10     Exhibit 6 before you?

11             THE WITNESS:  Yes, I do, your Honor.

12             THE COURT:  Okay.  Can you look at pages eight and

13     nine of Exhibit No. 6, please?

14             THE WITNESS:  Eight and nine.  Yeah.

15             THE COURT:  Yeah.  Can you tell me why there are two

16     dates, a June 19th, 2012, and a September 18th, 2012?

17             THE WITNESS:  Yes.  So we first signed it in June

18     19th, and then my father-in-law insisted that we do this in

19     front of a notary as well.

20             THE COURT:  Okay.  So on September 18th, 2012, you and

21     Mrs. Banerjee appeared in front of the same notary and signed

22     at the same time; is that right?

23             THE WITNESS:  Correct.

24             THE COURT:  Did you have --

25             THE WITNESS:  And this is around the same time,

1    your Honor, that she was moving to Pittsburgh.

2            THE COURT:  Why did your father-in-law insist that it

3    be signed in front of a notary?

4            THE WITNESS:  I don't know.

5            THE COURT:  What did he say to you about it?

6            THE WITNESS:  He said that it will be better if this

7    is done in front of a notary so it's legal.

8            THE COURT:  What was your understanding of why it

9    would be better?

10           THE WITNESS:  I figured that official documents are

11   done in front of a notary so that's why he wanted it, which is

12   what he explained to me.  And so I said fine, I have no

13   problems with it.

14           THE COURT:  And this was not filed with any court --

15           THE WITNESS:  No.

16           THE COURT:  -- ever?

17           Were copies of this separation agreement distributed

18   or given to anybody other than you and Mrs. Banerjee?

19           THE WITNESS:  Only to my lawyer later on.

20           THE COURT:  Which lawyer?

21           THE WITNESS:  Ted Folkman.

22           THE COURT:  Why did you give it to him?

23           THE WITNESS:  Because he wanted to establish --

24   because he was asking for the history.  I was about to retain

25   him for the appeals --

1              THE COURT:  In this case?

2              THE WITNESS:  In this case, yeah.

3              THE COURT:  All right.  But before that, it had never

4      been disclosed to anyone else?

5              THE WITNESS:  No.  I don't -- not from my side.

6              THE COURT:  And it's your testimony today that you

7      never spoke to or knew the name of the lawyers who your wife

8      consulted to draft the separation agreement?

9              THE WITNESS:  I don't.  To this day, I don't.

10             THE COURT:  Okay.  All right.  Let's bring Mrs.

11     Banerjee back in.  We're going to finish with the testimony for

12     today.

13             Unless you have followup questions on separation

14     agreement only.

15             MR. HUTMAN:  I have some questions on the separation

16     agreement.  Can I do them now?

17             THE COURT:  Yes.

18             MR. HUTMAN:  It may take a few minutes.

19             THE COURT:  Let's finish with the separation agreement

20     and then we'll have Mrs. Banerjee back in.

21     BY MR. HUTMAN:

22     Q.  Mr. Banerjee, in the separation agreement on the first

23     page, paragraph one, do you see that it says that you and Mrs.

24     Banerjee acknowledge that they both resided in Fairfield County

25     for 15 years, which satisfies the residency requirements in the

1    state of Connecticut?

2    A.  I believe -- yes, I see it.  Yes.

3    Q.  And isn't it true that to calculate those 15 years, you

4    have to include -- 15-plus years.

5            But isn't it true to calculate those 15-plus years,

6    you have to include the years between 2009 and 2012?

7    A.  I believe so.  She was a resident.  I mean, there's a

8    difference between residency and domicile.  So, yes, she was a

9    resident; we had the house.

10   Q.  But not just her, it says you as well.  You were also a

11   resident?

12   A.  Yes.  We had the house up until that point.

13   Q.  And prior to 2009, you don't dispute that you were

14   domiciled in Connecticut, correct?

15   A.  I do not.

16   Q.  And, Mr. Banerjee, if you look at the section that lists

17   the division of assets -- do you see that section?  It's

18   section 11, runs from page four to page five.

19   A.  Yes.

20   Q.  And that section lists a bunch of items that were to be

21   given to you or to Mrs. Banerjee; isn't that correct?

22   A.  Correct.

23   Q.  And one of those items is the home located at 23 Soundview

24   Farm; isn't that correct?  The very first item.

25   A.  Yes.

1  Q.  And it says over here that Mrs. Banerjee will retain

2  ownership of the home?

3  A.  Yes.

4  Q.  Isn't it true that despite what it says in the document,

5  you continued to use that home until 2015?

6  A.  No.  From time to time whenever I was visiting, because I

7  still -- as you know I talked about the Crossway Partner, so I

8  was here for business.  I used the house, but I got permission

9  from her.  I had keys.

10          THE COURT:  Okay.  Mr. Hutman, you're done for today.

11          You had keys.  Were those keys that you had from

12  before the separation at the time of the separation agreement?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  So Mrs. Banerjee never asked for

15  them back after the separation agreement?

16          THE WITNESS:  No, she didn't.

17          THE COURT:  So you had an understanding that you would

18  have access to the house even after you had signed the

19  separation agreement?

20          THE WITNESS:  I had an understanding that I had to --

21          THE COURT:  Yes or no, you had an understanding?

22          THE WITNESS:  Yes.  Yes.

23          THE COURT:  Okay.  After you both had signed the

24  separation agreement, if you were going to use the house in

25  Connecticut, did you have to tell her each time?

1           THE WITNESS:  Yes.

2           THE COURT:  And how did you tell her?

3           THE WITNESS:  I called her, told her.

4           THE COURT:  Did you get her agreement each time?

5           THE WITNESS:  Yes.

6           THE COURT:  And how did you get that agreement?

7           THE WITNESS:  She said:  Yeah, sure.

8           THE COURT:  But there was never anything in writing

9      after the separation agreement about --

10          THE WITNESS:  No.

11          THE COURT:  -- about when you could use the house?

12          THE WITNESS:  No.

13          THE COURT:  But you had keys the whole time?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  We're done for today.  Let's

16     have Mrs. Banerjee back in.

17          THE WITNESS:  Am I done, your Honor?

18          THE COURT:  Yes.  You can step down and go sit back at

19     the table.

20          All right.  This has been taking much longer than

21     we've needed to.  Despite my repeated instructions, Mr. Hutman,

22     to stick to the admissions you really only need from Mr.

23     Banerjee that aren't shown in the documents, we spent a lot of

24     time wrangling with Mr. Banerjee on whether he adopts or

25     doesn't adopt certain, you know, statements on documents.

1    Okay.  This has to stop, okay?  I understand that I may have

2    sort of taken you off of what your original plan was today.

3    But since we're going to be coming back for more of an

4    evidentiary hearing, I expect you to follow up with any cleanup

5    or followup questions with Mr. Banerjee differently next time.

6    Okay?

7              The other thing is that Mrs. Banerjee was excluded

8    from the courtroom for a good portion of this testimony.

9    Nothing is going to stop you from requesting and ordering a

10   copy of the transcript and presumably having a chance to review

11   it.  However, my very, very first question -- and I expect this

12   question to be under oath -- will be about how much

13   consultation has happened between Mr. and Mrs. Banerjee about

14   the testimony of the subject here, whether Mrs. Banerjee has

15   had access to the transcript in the interim, and what you

16   discussed.  Okay?

17             And, you know, understand that you are free to choose

18   to do what you want to do.  I'm going to strongly suggest that

19   Mrs. Banerjee maintain this wall of not knowing what was said

20   during the testimony when she was in the jury room, because I

21   will take that into account when I am assessing both of your

22   credibility.  And, indeed, that may even inform on whether I

23   believe you if you say that you haven't.  But I would like to

24   give you both the benefit of the doubt right now and strongly

25   suggest that you try not to give each other a heads-up on what

1      was said before.  Okay?

2              I will say right now, I have some serious concerns

3      about credibility here, okay?  I will also say that -- again, I

4      think this is a case that can be made largely on the documents.

5              So, Mr. Hutman, you don't have to hit a grand slam

6      with every sequence of questions that you have, okay?  You have

7      a lot of material.  You have a lot of statements under oath.

8      So take this time to look at how much you really do need, okay?

9      You're not going to get your Perry Mason moment.

10             All right.  Let's look at dates for a continuation of

11     the evidentiary hearing.  Do we think that we need to set aside

12     an entire day with a break for lunch?

13             MR. HUTMAN:  I think that's probably wise, even though

14     I don't think, given the Court's instruction, that I would need

15     that much more time.  Maybe another 20 minutes with Mr.

16     Banerjee and a half hour with Mrs. Banerjee, depending on how

17     she answers those.  It's hard for me to know.  And I may have

18     to cross on whatever they put in.

19             THE COURT:  Uh-huh.

20             MR. HUTMAN:  I'm loathed to have to come back a third

21     time, so I think it may be wise.  And then we can always stop

22     early and everyone gets to go home.

23             THE COURT:  So with that in mind, we are looking at

24     probably later in April at the earliest.

25             DEPUTY CLERK:  Early April?

1          THE COURT:  How are you on April 23rd?

2          MR. HUTMAN:  April 23rd is fine for the plaintiffs.

3          THE COURT:  April 23rd?

4          MRS. BANERJEE:  What day of the week, your Honor?

5          DEPUTY CLERK:  Thursday.

6          MRS. BANERJEE:  We don't have our calendars but I'm

7    assuming there should be no issues.

8          THE COURT:  Okay.  Scheduled far enough in advance.

9          If there is a conflict with April 23rd that is already

10   in your calendar, you will let me know today, okay?  I do not

11   want this adjourned anymore.  Let's set aside April 23rd for

12   the entire day with a lunch break, starting at 10:00 a.m. for

13   continuation of the evidentiary hearing.  Okay?

14          Anything else we need to deal with today?

15          MRS. BANERJEE:  I'm sorry.  I know I brought this up

16   earlier, and you mentioned you didn't have to talk about it.

17   But it is really key for me to point out that exhibit that Mr.

18   Hutman included in the exhibit list.

19          THE COURT:  I have your email from yesterday.  That's

20   sufficient.

21          MRS. BANERJEE:  Okay.  That's fine.  Thank you, ma'am.

22          MR. HUTMAN:  Does your Honor want a response from us

23   on that?

24          THE COURT:  You can submit a written response up to

25   three pages, single-spaced.

1          Is there any reason why that shouldn't be put on the

2     docket?

3          MR. HUTMAN:  None that I see, your Honor.

4          THE COURT:  Okay.

5          MR. HUTMAN:  And if your Honor doesn't need it, then

6     we're happy, you know, not to put in a response.  It's just if

7     your Honor wants a response, I can put that in.

8          THE COURT:  I don't think I need a response.

9          MR. HUTMAN:  Okay.

10         THE COURT:  Because my aim is to get to what we need

11    to get to without dealing with that exhibit.  Okay?

12         All right.  There may be -- check the docket.  There

13    may be interim orders that come through between now and April

14    23rd, because I want to try to streamline the hearing the next

15    time.  Okay?  But as of right now, I don't have anything in

16    mind.  But do check the docket periodically to make sure that

17    nothing gets filed.

18         I will ask both of you -- and this means Mr. Banerjee

19    and Mr. Hutman -- that if you see something, make sure the

20    other side knows about it, okay?  If you see something show up

21    on the docket, make sure the other side knows about it.  Okay?

22    And any other interim disputes, which I hope will not occur,

23    again, put it in a one-page joint letter AND let me know what

24    it is.  I'll try to get you on the phone to figure it out.  But

25    I don't anticipate that should be an issue between now and

K33LSADH                      Banerjee - Direct

1    April 23rd.  Okay?

2              MR. BANERJEE:  Thank you.

3              MR. HUTMAN:  Thank you.

4              THE COURT:  Thank you.  We are adjourned.

5              MR. HUTMAN:  Thank you.

6              THE COURT:  Mr. Hutman, I'm going to ask that you

7    order a copy of the transcript and provide a copy to chambers

8    and to Mr. Banerjee.

9              And, again, with the same instruction, Mr. Banerjee,

10   that -- you know, I strongly suggest that you keep that portion

11   of the transcript away from Mrs. Banerjee and not discuss it.

12             MR. BANERJEE:  Right.

13             THE COURT:  Okay?  All right.  Thank you.  We are

14   adjourned.

15             MR. HUTMAN:  Thank you, your Honor.

16             MR. BANERJEE:  Thank you, your Honor.

17                        ******

18

19

20

21

22

23

24

25